Filed 12/6/16 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| EAST SACRAMENTO PARTNERSHIPS FOR A LIVABLE CITY, <br><br>   Plaintiff and Appellant, <br><br>  v. <br><br>CITY OF SACRAMENTO et al., <br><br>   Defendants and Respondents. <br><br>ENCORE McKINLEY VILLAGE, LLC, <br><br>   Real Party In Interest and Respondent. | C079614 <br><br>(Super. Ct. No. 34-2014-80001851-CU-WM-GDS) <br><br>MODIFICATION OF OPINION UPON DENIAL OF PETITION FOR REHEARING <br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 7, 2016, be modified as follows:

1. On page 21, the first full sentence (which is a continuation of a paragraph that begins on page 20) that reads, "But they do not explain why the context makes a difference" will be replaced. That sentence will now read:

But they do not explain why the rule differs with the context.

2. On page 22, in the first full paragraph, the third sentence that reads, "The EIR found these impacts to be less than significant based solely on the mobility element in the City's general plan" shall be modified. That sentence will now read:

The EIR found these impacts to be less than significant based solely on the mobility element in the City's general plan, without any *evidence* that such impacts were insignificant. Indeed, the Master EIR for the City's 2030 general plan, which adopted the mobility element at issue, recognized that the impact of traffic increases above LOS D-E were "significant and unavoidable."

3. On page 22, in the first full paragraph, the fourth sentence that reads, "However, the EIR finds similar changes to LOS conditions in East Sacramento, outside the core area, *are* significant impacts and require mitigation" the word "However" will be changed to "Further." That sentence will now read:

Further, the EIR finds similar changes to LOS conditions in East Sacramento, outside the core area, *are* significant impacts and require mitigation.

Respondents' request for judicial notice filed November 22, 2016, is denied.

Appellant's request filed November 18, 2016, requesting to correct its name in the opinion from "East Sacramento Partnership for a Livable City" to "East Sacramento Partnerships for a Livable City" is granted.

As modified, the petition for rehearing is denied.  This modification does not change the judgment.

FOR THE COURT:

_____/s/_____
RAYE, P. J.


_____/s/_____
BUTZ, J.


_____/s/_____
DUARTE, J.

Filed 11/7/16 (unmodified version)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| EAST SACRAMENTO PARTNERSHIP FOR A LIVABLE CITY, | C079614 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2014-80001851-CU-WM-GDS) |
| v. | |
| CITY OF SACRAMENTO et al., | |
| Defendants and Respondents; | |
| ENCORE McKINLEY VILLAGE, LLC, | |
| Real Party In Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Reversed with directions.

Larson Willis & Woodard, Geoffrey Keith Willis; Brown Rudnick and Stephen Robert Cook for Plaintiff and Appellant.

James Sanchez, City Attorney, Brett M. Witter, Supervising Deputy City Attorney, and Jeffrey C. Heeren, Deputy City Attorney for Defendants and Respondents.

1

Thomas Law Group, Tina A. Thomas, Ashle T. Crocker, Amy R. Huguera, and Meghan M. Dunnagan for Real Party in Interest and Respondent.


Real Party in Interest Encore McKinley Village, LLC (Encore) proposed to construct the McKinley Village Project (the Project), a 328-unit residential development on a 48.75-acre site located in East Sacramento and bounded on the south and east by Union Pacific Railroad tracks and on the north and west by the Capital City Freeway. The City of Sacramento certified the Project's environmental impact report (EIR) and approved the Project.

East Sacramento Partnership for a Livable City (ESPLC), a neighborhood group, appeals from denial of its petition for a writ of mandate and complaint for declaratory and injunctive relief to set aside the City's approval of the Project. ESPLC contends the City violated the California Environmental Quality Act (CEQA) (Pub. Res. Code, § 2100 et seq.)[1] when it approved the Project because (1) the Project description is defective; (2) there was illegal piecemealing; (3) the EIR failed to analyze significant health risks; (4) the EIR ignored significant traffic impacts; and (5) the EIR failed to disclose or mitigate methane migration. Further, ESPLC contends the Project is inconsistent with the City's general plan.

We find merit in only the fourth contention. ESPLC challenges the threshold of significance used in the EIR to determine whether traffic impacts are significant. The City relied on policies in its general plan that permit congested traffic conditions within the core area of the City, thus finding no significant impact of congested traffic on neighborhood streets. As we explain in Part I E 2, compliance with a general plan policy does not conclusively establish there is no significant environmental impact, and the City

---

[1] Further undesignated statutory references are to the Public Resources Code.

2

failed to explain why it found none in this circumstance.  We reverse the judgment and remand for the City to correct this deficiency in the EIR.

## BACKGROUND

*The Project*

The Project, as finally approved, is a 336-unit residential development with a community recreation center and three parks on a 48.75-acre site.  The Project is residential infill, designed to be consistent with the quality and character of the adjoining East Sacramento and McKinley Park neighborhoods.  The Project site is roughly football-shaped and sandwiched between Interstate 80 Business Route (Capital City Freeway) to the north and the Union Pacific Railroad tracks to the south.  The site meets the City's definition of land targeted for infill development.

To the north of the Project, across the freeway, is the former 28th Street Landfill, now designated Sutter's Landing Regional Park.  To the southwest is a residential neighborhood in midtown Sacramento.  To the south, across the railroad tracks, is the Cannery Business Park on C Street.  Across C Street is a residential neighborhood in East Sacramento.

There will be two points of access to the Project.  The first is the upgrade of the existing A Street Bridge, which will connect the Project to 28th Street in midtown.  The second is a new underpass under the Union Pacific railroad embankment to C Street, between 40th Street and Tivoli Way.  Both access points will accommodate vehicular, bicycle, and pedestrian traffic.

*The EIR*

The EIR studied and analyzed the Project's impacts compared to two baselines, the existing conditions (existing plus project) and future or cumulative conditions (cumulative plus project).  The cumulative conditions were based on a build-out of the City's 2030 general plan.  The EIR found no project specific or cumulative impacts that could not be avoided; all impacts could be mitigated to a less than significant level.

3

In response to concerns about the health risks to residents of the Project, a health risk analysis accompanied the EIR. This study determined the potential cancer risk to future residents due to diesel particulate matter emissions from diesel trucks and locomotives. The study concluded the cancer risk for the majority of residents was 80 in one million; at one residence, the risk was 120 in one million. These values were within accepted levels.

The primary issue was traffic. The EIR analyzed traffic impacts using the level of service (LOS) method, with a scale of A to F. LOS A is free flowing traffic and LOS F is congested, "stop and go" traffic. The EIR studied 32 intersection and 19 roadway segments. It found significant traffic impacts at some intersections under cumulative plus project conditions and included a number of traffic mitigation measures to reduce those impacts to less than significant.

*City Approval and Subsequent Challenge*

On April 29, 2014, by a vote of six to three, the City certified the EIR for the Project, adopted the findings of fact, adopted mitigation measures within the City's responsibility and jurisdiction, and adopted the Mitigation Monitoring Program.

The following month, ESPLC filed a petition for writ of mandate and complaint for declaratory and injunctive relief, challenging the City's decision to approve the Project. ESPLC contended there were numerous violations of CEQA, and approval of the Project violated the City's general plan. ESPLC sought a declaration that the Project approval was invalid and an injunction against any further action on the project.

The trial court denied the petition and ESPLC appealed.

4

## DISCUSSION

### I

### *Alleged CEQA Violations*

A. *Standard of Review*

Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." The CEQA Guidelines[2] define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).)

In applying this substantial evidence standard to an action to set aside an agency's decision under CEQA, we resolve reasonable doubts in favor of the agency's decision. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights*).) "A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The

---

[2] The regulations implementing CEQA are codified at California Code of Regulations, title 14, section 15000 et seq. and are called the State CEQA Guidelines (14 Cal Code Regs., tit. 14, § 15001). These regulations are hereinafter referred to as CEQA Guidelines.

purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Ibid.*)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [City] and whether it contains substantial evidence to support the [City's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) [3]

B. *Adequacy of Project Description*

"An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193 (*County of Inyo*).) However, the "CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal. [Citation.]" (*Id.* at p. 199.) "Under section 21166, subdivision (a), once an agency has prepared an EIR, no subsequent EIR is required unless substantial changes are proposed in a project that will require major changes in the EIR."

---

[3] Because we review the City's decision, not the trial court's, we reject the argument of the City and Encore that ESPLC forfeited its claims by failing to address the trial court's decision and explain how the trial court erred.

6

(*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn*. (1986) 42 Cal.3d 929, 935-936.)

The project description in the EIR must include "[a] list of permits and other approvals required to implement the project." (CEQA Guidelines, § 15124, subd. (d)(1)(B).) ESPLC contends the project description omitted numerous City approvals, including a development agreement, a rezoning request to allow multi-family residences, an increase in the number of residential units from 328 to 336, and variances for driveway widths.

"Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. (§ 21005, subd. (b).) This court has previously explained, '[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citations.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 (*AIR*).)

### 1. *Development Agreement*

A development agreement qualifies as an approval that must be included in the project description. (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 926 (*Rialto*).)

The draft EIR identified a large lot tentative subdivision map as one of the City approvals required. This map is properly called a master parcel map and requires a development agreement. The final EIR changed the terminology to a master parcel map and added that a development agreement was required. The development agreement was included in the notice of the March 13, 2014, planning and design commission meeting and the April 29, 2014, city council meeting on the Project. ESPLC commented on the development agreement. Thus, the development agreement was adequately disclosed both for "informed decisionmaking and informed public participation" before the City certified the EIR and approved the Project. (*AIR*, *supra*, 107 Cal.App.4th at p. 1391.)

7

ESPLC contends the City failed to proceed in the manner required by law because the EIR did not analyze the development agreement. CEQA "does not require an analysis in the EIR of each and every activity carried out in conjunction with a project." (*Native Sun/Lyon Communities v. City of Escondido* (1993) 15 Cal.App.4th 892, 909-910.) It is sufficient if the EIR makes reference to the development agreement to alert "persons interested in that document to its relevance in the decisionmaking process." (*Id.* at p. 909.) Similarly, it is sufficient if, as here, the development agreement is included in the notice of the public hearing on the Project before the city council. (*Rialto, supra,* 208 Cal.App.4th at p. 927.)

ESPLC argues the development agreement should have been analyzed in the EIR because it was modified to change the Project and this substantial change was never analyzed.

A major concern regarding the Project was the limited access. Several comments requested a vehicular tunnel at Alhambra Boulevard as a condition of the Project. Several residents made this point at the city council meeting on approval of the Project. At the beginning of that meeting, Councilman Hansen proposed modifying the development agreement to make a vehicular tunnel at Alhambra Boulevard into a City project. He called the tunnel a " 'capital improvement project' " and couched it as "the most secure way that we can get vehicular access at this project." The developer had agreed to contribute $2.2 million for a tunnel, either vehicular or bicycle; the vehicular tunnel would be the City's top priority and the developer would provide $100,000 for study of the feasibility of such a tunnel.

Contrary to ESPLC's argument, the City did not agree to build the Alhambra Boulevard vehicular tunnel or approve it. Rather, it simply expressed a preference for such a tunnel and agreed to study its feasibility. A feasibility study does not require an EIR. (CEQA Guidelines, § 15262.) Further, it is questionable whether a vehicular tunnel at Alhambra Boulevard will be built. The EIR found the Alhambra tunnel to be

8

infeasible due to the cost, estimated at $28.4 million, the need for approval from Union Pacific, the need to construct temporary tracks, and impact on nearby properties. The City agreed as to this finding of infeasibility. A vehicular tunnel at Alhambra Boulevard was not part of the Project and did not need to be included in the Project description.

### 2. *Expanded Rezoning*

At the time of the draft EIR, the Project included 328 single-family residential units. In response to requests for housing diversity, the number of housing units was increased to 336; the number of single family homes was decreased and a new type of housing was added, the Parkside Flats, consisting of 24 two-story attached units around the Project's central park. The final EIR noted the necessary rezoning for multi-family units and analyzed the effect of the increased number of units, finding the increase in the number of students would not exceed the capacity of local schools. It also found there would be no significant increase in demand for services, and that the slight increase in traffic would have no significant impact.

ESPLC contends the project description in the draft EIR omitted the necessary rezoning for multi-family units and the increase in the number of units and this omission made the project description fatally defective. This slight change, the addition of eight housing units, is the type of change to be expected during the CEQA process. (*County of Inyo, supra,* 71 Cal.App.3d at p. 199.) ESPLC has failed to show how the analysis in the final EIR was defective or that the slight increase in housing units precluded meaningful decision making or public comment.

### 3. *Variance for Driveways*

Residences next to the freeway or railroad tracks are in four-house clusters and their driveways are in a T-court configuration. These driveways are 20 feet wide rather than the City standard of 24 feet. The draft EIR did not include the need for a driveway variance as one of the necessary approvals of the Project. It was added in the final EIR.

9

ESPLC contends "the City failed to proceed in the manner required by law" by failing to include this approval in the project description.  ESPLC fails to show any prejudice from the omission or that the narrower driveways had any significant impact on the environment.  The contention fails.

C.  *Piecemealing*

"CEQA mandates that environmental considerations do not become submerged by chopping a large project into many little ones, each with a potential impact on the environment, which cumulatively may have disastrous consequences.  [Citation.]  CEQA attempts to avoid this result by defining the term 'project' broadly.  [Citation.]  A project under CEQA is the whole of an action which has a potential for resulting in a physical change in the environment, directly or ultimately, and includes the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies.  [Citation.]" (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 592.)

The process of attempting to avoid a full environmental review by splitting a project into several smaller projects which appear more innocuous than the total planned project is referred to as "piecemealing."  (See *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1358 (*Berkeley Jets*).)  Our Supreme Court set forth the relevant standard:  "We hold that an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects.  Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project." (*Laurel Heights, supra,* 47 Cal.3d at p. 396.)

Improper piecemealing occurs "when the purpose of the reviewed project is to be the first step toward future development" or "when the reviewed project legally compels

10

or practically presumes completion of another action." (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1223.) By contrast, an EIR need not analyze "specific future action that is merely contemplated or a gleam in a planner's eye. To do so would be inconsistent with the rule that mere feasibility and planning studies do not require an EIR." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 398.)

### 1. *Alhambra Boulevard Vehicular Tunnel*

ESPLC contends the City engaged in illegal piecemealing because it failed to analyze the vehicular tunnel proposed at Alhambra Boulevard. As discussed, the City did not approve a vehicular tunnel at Alhambra Boulevard; it approved only studying the feasibility of such a project. A feasibility study does not require an EIR. (CEQA Guidelines, § 15262.) While the tunnel would be used only for access to and from the Project, it is not a necessary part of the Project and the Project was not conditioned upon its construction. There are two other points of vehicular access to the Project: A Street and an extension between 40th Street and Tivoli Way to C Street. Further, construction of the Alhambra vehicular tunnel is not reasonably foreseeable. Rather, it is currently deemed infeasible, due to its considerable expense, the need for Union Pacific approvals, and the difficulties and impacts of construction.

### 2. *Half-Street Closure on 28th Street*

The draft EIR disclosed that the Project would add approximately 1,100 daily trips to 28th Street south of C Street. The draft EIR concluded this increase was not a significant impact, but because 28th Street was a local street in a residential neighborhood, the EIR suggested the City should monitor the traffic volumes to determine if a half-street closure was necessary. The half-street closure would divert traffic to C Street and then to 29th Street. C Street carries less traffic than 28th Street and 29th Street is a larger road. The final EIR noted that several comments supported a half-street closure at 28th and C Streets. It concluded a half-street closure on 28th Street could be utilized, and "[a]dditional traffic calming measures would most likely be needed

11

at C Street west of 28th Street." The draft minutes of the city council meeting to approve the Project indicate the council also passed a motion to include a half-street closure at 28th and C Streets. That motion is not cited to by either party and we have not found it in the 55,000-page administrative record.

ESPLC contends the EIR should have disclosed and analyzed the potential impacts of the half-street closure at 28th Street.

The trial court found the half-street closure would result in diverting 114 to 124 vehicles during peak hours from one local road (28th Street) to another that had less traffic (C Street) and then to a major collector road with greater capacity (29th Street). Thus, the effect of the half-street closure would be to reduce the traffic impact on 28th Street and move the traffic to streets better able to handle the increase. This type of minor change does not require a new EIR. (*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn., supra*, 42 Cal.3d at p. 936.) This modest change by the City in response to traffic concerns is not illegal piecemealing.

### 3. *Sutter's Landing Parkway* (*Connector*)

ESPLC contends the failure to analyze the Alhambra tunnel and the half-street closure "are especially troubling given the city council's decision, also at the last minute, to remove nearby Sutter's Landing Parkway from its General Plan." Sutter's Landing Parkway is proposed construction of a new east-west roadway between 28th Street and Richards Boulevard. Also proposed is an interchange between Sutter's Landing Parkway and the Capital City Freeway.

As part of the motion authorizing the half-street closure, the city council directed the city manager to "remove the Sutter Landing Connector from the General Plan at the next major update." As that motion is not in the record, we cannot determine exactly what the City agreed to do. The trial court found that "technically" the City agreed to *consider* removing the connector from the general plan. ESPLC does not explain how the possible removal of Sutter's Landing Parkway, or the interchange connector, from the

12

general plan makes the failure to discuss the Alhambra tunnel or the 28th Street half-street closure illegal piecemealing. As respondents note, any amendment to the general plan will require CEQA review. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 793.)

D. *Failure to Analyze Significant Health Risks*

ESPLC contends the EIR failed to analyze or address the significant health risks posed to future residents of the Project, particularly the increased cancer risk and the risk of methane gas migration.[4]

The Project is bounded by a freeway and railroad tracks, and thus subject to toxic air contaminants (TAC's), which are airborne pollutants that pose a potential hazard to human health. The Project is also near the former 28th Street landfill, which has the potential for off-site subsurface gas (methane) migration. The northern portion of the Project contains two groundwater monitoring wells and six soil gas probes, used as part of the post-closure monitoring of the closed landfill.[5]

The trial court found, based on decisions of courts of appeal, that CEQA did not require an EIR to analyze the existing effects of the environment on future residents of the Project. The California Supreme Court recently approved that position in *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369 (*CBIA*). Our high court held: "[A]gencies subject to CEQA generally are not required to analyze the impact of existing environmental conditions on a project's future users or residents. But when a proposed project risks exacerbating those environmental hazards or conditions that already exist, an agency must analyze the potential impact of such

---

[4] In the trial court, ESPLC also contended the EIR failed to analyze noise at the Project. ESPLC now reframes the argument relating to noise as a failure to comply with the general plan, see Part II D, *post*.

[5] New residents in the Project will be given written notice of the former landfill and monthly gas monitoring.

13

hazards on future residents or users. In those specific instances, it is the *project's* impact on the environment—and not the *environment's* impact on the project—that compels an evaluation of how future residents or users could be affected by exacerbated conditions." (*Id*. at pp. 377-378.) "[N]owhere in the statute is there any provision . . . plainly delegating power for the agency to determine whether a project must be screened on the basis of how the environment affects its residents or users." (*Id.* at p. 387.)

Much of ESPLC's argument is that the site of the Project is an unhealthy place to live. This argument is similar to that made and rejected in *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560. "Here, a significant part of [project opponent's] concern was that '[a]llowing housing to be built on the Stock Farm property across the street from a heavily used equestrian facility will create untold problems for the City and those residents who would move there. No residential development should be allowed where such traffic—horses, cars, trucks and trailers—exists.' [*CBIA*] holds this type of impact is outside CEQA's scope. [Citation.]" (*Id*. at p. 582.)

What must be analyzed under CEQA is "a project's potentially significant *exacerbating* effects on existing environmental hazards—effects that arise because the project brings 'development and people into the area affected.' " (*CBIA, supra,* 62 Cal.4th at p. 388.) The court provided an example. "Suppose that an agency wants to locate a project next to the site of a long-abandoned gas station. For years, that station pumped gasoline containing methyl tertiary-butyl ether (MTBE), an additive—now banned by California—that can seep into soil and groundwater. [Citations.] Without any additional development in the area, the MTBE might well remain locked in place, an existing condition whose risks—most notably the contamination of the drinking water supply—are limited to the gas station site and its immediate environs. But by virtue of its proposed location, the project threatens to disperse the settled MTBE and thus exacerbate the existing contamination. The agency would have to evaluate the existing condition— here, the presence of MTBE in the soil—as part of its environmental review. Because

14

this type of inquiry still focuses on the *project's impacts on the environment*—how a project might worsen existing conditions—directing an agency to evaluate how such worsened conditions could affect a project's future users or residents is entirely consistent with this focus and with CEQA as a whole." (*Id.* at p. 389.)

ESPLC seeks to apply the exacerbation standard to health risks in the Project. It contends "[a]dditional vehicles, residents, visitors, and others coming to the property because of the Project will undeniably contribute to, and exacerbate, the already bad air quality, traffic, and other environmental conditions." The traffic concerns of the Project are discussed *post*. Beyond traffic impacts, ESPLC's vague claim of exacerbation, without any factual support, is insufficient. "[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence. [Citations.]" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1417 (*Gentry*).) " 'Unsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence . . . .' [Citation.] Thus, 'project opponents must produce . . . evidence, other than their unsubstantiated opinions, that a project *will produce a particular adverse effect*.' [Citation.]" (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 274.) As to the concern of increased air pollution, we note the Project is an infill residential project and without such projects, development would likely occur in more distant suburban areas, resulting in even more pollution from automobile commuter traffic. (See *CBIA, supra,* 62 Cal.4th at p. 379.)

E. *Ignoring Significant Traffic Impacts*

1. *Impact on Roadways*

ESPLC contends the EIR failed to analyze and propose mitigation for the Project's impact on freeways. "CEQA expressly allows streamlining of transportation impacts analysis for

15

certain land use projects based on metropolitan regional 'sustainable communities strategies.' " (*Center for Biological Diversity v. Department. of Fish and Wildlife* (2015) 62 Cal.4th 204, 230.) The City relied on that streamlining. Under section 21159.28, if a project is consistent with the region's sustainable communities strategy (SCS), the EIR is not required to reference, describe, or discuss project or cumulative effects on the regional transportation network, provided the project incorporates mitigation measures in prior environmental documents. (§ 21159.28, subd. (a).) Here, the applicable region is the Sacramento Area Council of Governments (SACOG). The Project is consistent with SACOG's SCS and Metropolitan Transportation Plan (MTP). Nonetheless, the EIR did provide information as to the impact of the project on the Capital City Freeway.

ESPLC asserts there is no regional traffic impact fee and no nonconstruction-related transportation mitigation measures are included in the general plan EIR. Therefore, ESPLC argues, "the intent of [] section 21159.28 is not met here, and the City erred in relying on it as an excuse to not analyze and address the Project's significant freeway impacts." The statute does not require specific mitigation measures, only that if there are such measures, the project incorporate them. The record indicates the Project will be developed consistent with the applicable mitigation measures in the SACOG MTP/SCS Program EIR. ESPLC has failed to show error in the City's reliance on section 21159.28.

ESPLC next faults the EIR for failing to analyze roadway segments; instead the EIR focused on intersections. The EIR studied 32 intersections. Information on nearly 20 roadway segments was provided but labeled "for information purposes only."

The EIR explained that its traffic analysis was focused on intersections rather than roadway segments because roadway capacity was governed by intersections. Under the Traffic Impact Analysis Guidelines, the decision on which to study should be made on an individual project basis. These guidelines further state that in general, intersections rather

16

than roadways should be studied when analyzing in-fill areas. Substantial evidence supports the City's methodology in focusing on intersections.

ESPLC contends the City was required to recirculate the EIR because the final EIR identified a new roadway segment impact. In the draft EIR, C Street between Alhambra Boulevard and 33rd Street was identified as a major collector road operating at LOS A under both existing and existing plus conditions and at LOS B under cumulative plus project conditions. In the final EIR, the road designation was corrected to a local (rather than major collector) road. Under the local designation, the road segment operates currently at LOS D and at LOS E with the Project, and at LOS F under cumulative plus project conditions.

As we have explained, the EIR focused on impacts to intersections rather than roadway segments, and substantial evidence supported the decision to focus on intersections. Further, although the level of service designation changed in the final EIR due to the correction to the roadway segment's designation, there was no change in the *amount of traffic* on this roadway segment between the draft and final EIR. The impact was not new, only the designation and corresponding LOS classification.

With respect to the " 'for informational purposes' " examination of roadway segments, ESPLC contends the EIR omitted several roadway segments that will be impacted by the Project. ESPLC identifies 29th Street, 30th Street, and 33rd Street, and relies on comments made by its traffic expert. That expert, Hexagon Transportation Consultants, Inc., questioned various assumptions, traffic models, and conclusions of the draft EIR as to the traffic impacts.

"Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (CEQA Guidelines, § 15151.) "When the evidence on an issue conflicts, the decisionmaker is 'permitted to give more weight to some of the evidence and to favor the

17

opinions and estimates of some of the experts over the others.' [Citation.]" (*AIR, supra,* 107 Cal.App.4th at p. 1397.)

"When a challenge is brought to studies on which an EIR is based, 'the issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the' agency's decision. [Citation.] 'A clearly inadequate or unsupported study is entitled to no judicial deference.' [Citation.] The party challenging the EIR, however, bears the burden of demonstrating that the studies on which the EIR is based 'are clearly inadequate or unsupported.' [Citation.]" (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 795.)

ESPLC has failed to carry its burden to show the traffic studies are inadequate. ESPLC objects to the omission of certain roadway segments, but fails to explain how the analysis of intersections on these same streets in the draft EIR is inadequate to analyze the traffic impact of the Project.

### 2. *Thresholds of Significance*

ESPLC contends the City failed to properly adjudge the significance of the traffic impacts of the project. In particular, ESPLC faults the EIR for relying on general plan traffic policies, which ESPLC categorizes as non-CEQA standards, to find that LOS E and LOS F conditions on City streets are not significant impacts.

The draft EIR explains the threshold of significance used to determine significant impacts. "The significance criteria used to evaluate the project impacts are based on Appendix G of the CEQA Guidelines, the thresholds adopted by the City in applicable general plans and previous environmental documents, and professional judgment." For intersections, there is a significant impact if traffic generated by the project degrades LOS from an acceptable to unacceptable LOS. If the LOS is already unacceptable, a

significant impact occurs when traffic generated by the Project increases the average vehicle delay by five seconds or more.[6]

Under General Plan Mobility Element Policy M 1.2.2, the City allows for flexible LOS standards. In the core area, bounded by C Street, the Sacramento River, 30th Street, and X Street (downtown and midtown), LOS F conditions are acceptable during peak hours. In multi-model districts, characterized by frequent transit service, mixed uses, and high density, LOS A-E shall be maintained and in other areas, LOS A-D shall be maintained. In either case, up to LOS F conditions may be acceptable to achieve other goals, provided there are improvements to the overall system or non-vehicular transportation is promoted.

Using this general plan policy as the threshold of significance, the EIR found no significant impact on 28th Street or its intersection with E Street under existing plus Project conditions, although the level of service went from LOS C to LOS E for the street, and LOS A to LOS D for the intersection in the morning. The intersection at E Street and 29th Street went from LOS C to LOS E in the morning. The impacts are greater, in some cases LOS F, under the cumulative plus project conditions, but the EIR found no significant impacts.

"CEQA grants agencies discretion to develop their own thresholds of significance (CEQA Guidelines, § 15064, subd. (d))." (*Save Cuyama Valley v. County of Santa*

---

[6] In Senate Bill No. 743 (2013-2014 Reg. Sess.), the Legislature has recognized the conflict between considering vehicle delay to be an environmental impact and encouraging infill projects to reduce greenhouse gas emissions and traffic-related air pollution. (Stats. 2013, ch. 386, § 5.) New section 21099, subdivision (b)(1) requires the Office of Planning and Research to prepare new guidelines for establishing criteria for determining the significance of transportation impacts of certain infill projects. Once these guidelines are certified, automobile traffic delays, as described solely by LOS or similar measures, shall not be considered a significant impact on the environment, with some exceptions. (*Id.,* subd. (b)(2).)

19

*Barbara* (2013) 213 Cal.App.4th 1059, 1068.) That discretion, however, is not unbounded, as the determination that the Project has no significant environmental impact must be supported by substantial evidence. (§ 21168.5.) In *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98 (*CBE*), overruled on another ground in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, footnote 3, this court upheld invalidation of a CEQA Guideline that directed an agency to find an environmental impact not significant if it complies with a regulatory standard. We found the guideline "relieves the agency of a duty it would have under the fair argument approach to look at evidence beyond the regulatory standard, or in contravention of the standard, in deciding whether an EIR must be prepared." (*Id*. at p. 113.) A regulatory standard could not be applied so as to foreclose consideration of substantial evidence showing a significant environmental impact from a project. (*Id*. at p. 114.)

Compliance with a general plan in and of itself "does not insulate a project from the EIR requirement, where it may be fairly argued that the project will generate significant environmental effects." (*City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1332.) A project's effects can be significant even if "they are *not* greater than those deemed acceptable in a general plan." (*Gentry, supra,* 36 Cal.App.4th at p. 1416; also *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 732 [EIR required "if substantial evidence supports a fair argument that the Project may have significant unmitigated noise impacts, even if other evidence shows the Project will not generate noise in excess of the County's noise ordinance and general plan"]; *Berkeley Jets, supra,* 91 Cal.App.4th at p. 1381 ["the fact that residential uses are considered compatible with a noise level of 65 decibels for purposes of land use planning is not determinative in setting a threshold of significance under CEQA"].)

The City and Encore cursorily contend these cases are not applicable because they address a threshold of significance in the context of deciding whether to prepare an EIR

in the first instance, not in the context of a completed EIR's application of significance thresholds. But they do not explain why the context makes a difference.

In *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099 (*Amador Waterways*), this court addressed the two uses of thresholds of significance and found the *CBE* rule applied to both. A threshold of significance is used to determine whether an EIR must be prepared. (*Id.* at pp. 1106-1107.) Thresholds of significance are also used in preparing the EIR: "[I]n preparing the EIR, the agency must determine whether any of the *possible* significant environmental impacts of the project will, in fact, be significant. In this determination, thresholds of significance can once again play a role. As noted above, however, the fact that a particular environmental effect meets a particular threshold cannot be used as an automatic determinant that the effect is or is not significant." (*Id.* at p. 1109.) "Thus, in preparing an EIR, the agency must consider and resolve every fair argument that can be made about the possible significant environmental effects of a project, irrespective of whether an established threshold of significance has been met with respect to any given effect." (*Ibid.*)

In *Amador Waterways,* the project at issue was replacement of a 130-year-old canal with a pipeline. Because leakage from the canal contributed to flow in streams, the pipe would reduce these flows, turning some streams into seasonally intermittent streams, and significantly reducing the flow in one. (*Amador Waterways, supra*, 116 Cal.App.4th at pp. 1102, 1111.) The agency found the reduction in stream flows was insignificant based on the threshold of significance developed from the standardized Appendix G of the CEQA Guidelines, and plaintiff challenged that determination because the threshold of significance did not address reduction in stream flows. (*Id*. at p. 1111.) We found the EIR insufficient because the reduction in stream flows was an effect on the environment and the EIR failed to explain why it was insignificant. Section 21100, subdivision (c) requires an EIR to "contain a statement briefly indicating the reasons for determining that various effects on the environment of a project are not significant and consequently have

21

not been discussed in detail in the environmental impact report." (See also CEQA Guidelines, § 15128.)

Here, the EIR found traffic impacts at intersections on 28th and 29th Streets that changed conditions from LOS C to LOS E and from LOS A to LOS D under existing plus project conditions.[7] Under cumulative plus project conditions, several intersections on 28th, 29th, and 30th Streets are at LOS F, with significant delays. The EIR found these impacts to be less than significant based solely on the mobility element in the City's general plan. However, the EIR finds similar changes to LOS conditions in East Sacramento, outside the core area, *are* significant impacts and require mitigation. Accordingly, there is evidence of a significant impact on traffic on 28th, 29th, and 30th Streets. As in *Amador Waterways,* the EIR contains no explanation why such increases in traffic in the core area are not significant impacts, other than reliance on the mobility element of the general plan that permits LOS F in the core area during peak times.

In response to a comment questioning the City's discretion in establishing its own LOS thresholds of significance, the final EIR states that the LOS thresholds of the City's general plan reflect "community values." Such "community values" do not, however, necessarily measure environmental impacts. (Cf. *Berkeley Jets, supra,* 91 Cal.App.4th at p. 1381 [land use noise threshold not determinative for CEQA].) The core area of the general plan covers downtown and midtown Sacramento and includes both busy commercial and quiet residential streets. The CEQA Guidelines caution that "the significance of an activity may vary with the setting." (CEQA Guideline, § 15064, subd. (b).)

The general plan alone does not constitute substantial evidence that there is no significant impact. "[T]he fact that a particular environmental effect meets a particular

---

[7] We recognize that the half-street closure at C Street and 28th Street may affect the results of the traffic analysis. That street closure, however, was not analyzed in the EIR.

22

threshold cannot be used as an automatic determinant that the effect is or is not significant. To paraphrase our decision in *Communities for a Better Environment,* a threshold of significance cannot be applied in a way that would foreclose the consideration of other substantial evidence tending to show the environmental effect to which the threshold relates might be significant. [Citation.]" (*Amador Waterways, supra,* 116 Cal.App.4th at p. 1109.)

Because the EIR fails to explain or provide substantial evidence to support the finding of no significant traffic impact at these intersections, we must reverse the trial court's denial of ESPLC's petition for a writ of mandate and remand the case for issuance of a writ directing the City to set aside its certification of the final EIR and to take the action necessary to bring the transportation and circulation section of the EIR into compliance with CEQA. (See § 21168.9 [describing contents of court order after a finding of noncompliance with CEQA].) The City need only correct the deficiency in the EIR that we have just described before considering recertification of the EIR. (See *Amador Waterways, supra,* 116 Cal.App.4th at p. 1112.)

### 3. *Mitigation*

ESPLC contends the mitigation measures proposed for significant traffic impacts are infeasible or ineffective.

An EIR must propose and describe mitigation measures to minimize the significant environmental impacts identified in the EIR. (§§ 21002.1, subd. (a); 21100, subd. (b)(3); CEQA Guidelines, § 15126.4, subd. (a)(1).)

The EIR concluded the Project would exacerbate LOS F conditions at the H Street/Alhambra Boulevard intersection, but the impact would be less than significant if Mitigation Measure 4.9-1 were adopted. That mitigation measure requires Encore to pay the City to monitor and re-time the traffic signal at that intersection. ESPLC contends there is no evidence that mitigation measure will be effective.

23

In response to the comment by ESPLC's traffic consultant questioning the effectiveness of the mitigation measure, the final EIR responded the mitigation measure would improve the delay from 110 seconds to 40.8 seconds and referred to Appendix O (the Traffic Model Output Data) to the draft EIR for technical calculations. ESPLC has not addressed Appendix O or otherwise shown that it does not provide substantial evidence supporting the mitigation measure. "If the appellant fails to set forth all of the material evidence, its claim of insufficiency of the evidence is forfeited." (*Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp*. (2007) 148 Cal.App.4th 937, 951.)

For traffic impacts under cumulative plus project conditions, the mitigation measures required fair share contributions to various traffic improvements. ESPLC contends this is not legally sufficient mitigation because the City admits it has no fee program. ESPLC cites to a comment claiming freeway impacts should be mitigated to which the City responds there is no *regional network* mitigation program (such as a traffic fee program) for purposes of section 21158.29. ESPLC does not show where the City admitted there is no fair share program for *city* traffic. Instead, the City describes the program: "Fair share contributions collected from a project are required to be used for the purpose it was collected for and cannot be applied to other purposes. If the project is approved by the City of Sacramento, the fair share contributions, defined as mitigation, will be collected at the plan check review phase. Monies collected for this purpose will be placed in a special fund and will be used to fund improvements required at that location." ESPLC has not shown these mitigation measures are infeasible.

ESPLC contends one of the mitigation measures, 4.9-6, will result in removal of a bicycle lane on H Street for one block between 30th Street and Alhambra Boulevard and is therefore infeasible because it conflicts with policies of the general plan. We discuss this point in the next section.

24

## II

### *Consistency with General Plan*

ESPLC contends the Project is inconsistent with the City's general plan. Specifically, ESPLC contends the Project is inconsistent with transportation policies, transit policies, policies promoting health and well-being, and noise policies.

A. *The Law*

Local land use and development decisions must be consistent with the applicable general plan. (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 (*FUTURE)*.) "A project is consistent with the general plan ' "if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' [Citation.] A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a subdivision development must be 'compatible with' the objectives, policies, general land uses and programs specified in the general plan." (*Ibid*.)

"[T]he nature of the policy and the nature of the inconsistency are critical factors to consider." (*FUTURE, supra,* 62 Cal.App.4th at p. 1341.) Inconsistencies with vague, general policies that "encourage" actions may not be fatal. (See *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719.) An approval must be set aside, however, where there is an inconsistency with a mandatory policy. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 783 (*Endangered Habitat*).)

"A city's determination that a project is consistent with the city's general plan 'carries a strong presumption of regularity. [Citation.] This determination can be overturned only if the [city] abused its discretion—that is, did not proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. [Citation.] As for this substantial evidence prong, it has been said that a determination of general plan consistency will be reversed only if, based on the

evidence before the local governing body, " . . . a reasonable person could not have reached the same conclusion" [Citation.].' [Citation.]" (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 238 (*Clover Valley*); see also *Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 18-19)

"When we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" (*Save our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 (*Save our Peninsula*).)

B. *Transportation Policies*

ESPLC contends the Project is inconsistent with Mobility Element M 1.2.2 of the general plan, which requires the developer to make improvements to the citywide transportation system in exchange for accepting LOS E and LOS F conditions. Since this action commenced, the City has adopted a new 2035 general plan. Under the new general plan, Mobility Element M 1.2.2 has been amended and no longer requires improvements to the citywide transportation system as a condition of accepting LOS E or LOS F conditions. In *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 704-706 (*Sierra Club*), a challenge to a zoning ordinance based on inconsistency with the general plan became moot when, during pendency of the appeal, a new general plan was adopted with which the ordinance was consistent. In *La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2016) 2 Cal.App.5th 586, the appellate court

26

dismissed as moot a challenge to several exceptions to a neighborhood plan granted for construction of a large store after the city amended the plan to make the exceptions unnecessary. As in *Sierra Club* and *La Mirada*, because the Project is now consistent with Mobility Policy M 1.2.2, this contention is now moot.

ESPLC contends the Project is inconsistent with the Bikeway Master Plan because Mitigation Measure 4.9-6(a) (prohibiting on-street parking and increasing traffic lanes on H Street between 30th Street and Alhambra Boulevard) eliminates a dedicated bike lane. The City and Encore dispute that a bike lane is eliminated.

The EIR is inconsistent about whether a dedicated bike lane is eliminated. In response to comments challenging the mitigation measures, it asserts this mitigation measure "would not result in the loss of a bike lane." However, in response to the next comment (which the EIR misreads as only a request to prohibit on-street parking rather than a concern about losing a bike lane), the final EIR states "[t]he bike lane would be shared for a portion of the eastbound travel lane just west of 30th Street." In any event, a "project need not be in perfect conformity with each and every general plan policy." (*FUTURE, supra,* 62 Cal.App.4th at p. 1336.) Given the Project's commitment to bicycle transportation, the City could reasonably conclude the Project was consistent with the general plan despite the possible loss of a dedicated bike lane for one block. (*Clover Valley, supra,* 197 Cal.App.4th at p. 238.)

C. *Land Use and Environmental Policies*

ESPLC contends the project is inconsistent with land use policy 4.5.6 which requires new neighborhoods to include transit stops within one-half mile of all dwellings. This contention is moot because this provision of the general plan has changed. (*Sierra Club, supra,* 126 Cal.App.3d at pp. 704-706.) The 2035 general plan only "encourage[s]" transit stops within one-half mile; it is no longer a requirement.

ESPLC next contends the Project is inconsistent with several policies in the general plan designed to promote the health and well-being of the community by

27

protecting the public from the adverse effects of air pollution, noise, and other health hazards. ESPLC cites to three policies and one goal, but fails to mention--or dispute--the portions of the EIR that found the Project was consistent with these policies and goal. Further, these policies and goal are vague and subjective. In this situation our deference to the City's finding of consistency is the greatest because the City "in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." (*Save our Peninsula, supra,* 87 Cal.App.4th at p. 142.) ESPLC has not shown that " ' "a reasonable person could not have reached the same conclusion" ' " as to the Project's consistency with these policies and goal. (*Clover Valley, supra,* 197 Cal.App.4th at p. 238.)

D. *Noise Policies*

ESPLC raises three points concerning noise under a single heading challenging the noise impacts as inconsistent with the general plan. It contends first that the exterior noise level at residences near the freeway exceed the 60 dB limit under the general plan; second that the mitigation measures to reduce noise near the railroad tracks are not effective and there is no assurance they will be implemented; and third that the noise analysis fails to properly take into account a future rail line. The second and third points do not challenge the Project's consistency with the general plan; instead, they relate to the adequacy of the EIR and require a separate heading or subheading. (Cal. Rules of Court, rule 8.204(a)(1)(B).) Failure to follow this rule forfeits the argument. (*San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1135.)

The environmental noise assessment prepared for the Project studied traffic noise levels at private yards of residences near the freeway. It concluded that after construction

28

of a sound wall atop a four-foot earthen berm, the typical maximum noise levels in the backyard areas would be 60 dB.  That is the highest level of "normally acceptable" noise exposure for single family and duplex residences under the general plan.

ESPLC contends the noise level in some outdoor areas is actually higher.  In discussing interior noise and the mitigation required, the draft EIR states the exterior noise at building façades for residences near the freeway are 65-68 dB and less than 70 dB for houses in the second tier.  The difference in the noise readings, apparently, is that the noise assessment study measured noise only at the "private yards," are generally shielded by residences from noise, and there may be higher noise levels in the trash and recycling areas behind the houses that are not designed as "outdoor activity areas." ESPLC disputes that these areas behind the houses will be used solely for trash and the like and not for outdoor activity.

Assuming that the City noise levels apply to *all* outdoor areas, and that the noise readings conducted for purposes of mitigation of interior noise levels are accurate, we still cannot find an inconsistency with the general plan sufficient to set aside approval of the Project on this ground.

Environmental Constraint Policy 3.1.1 states:  "The City shall require noise mitigation for all development where the projected exterior noise levels exceed those shown in Table EC 1, to the extent feasible."  Because compliance is tied to feasibility, the policy is not mandatory, so an inconsistency does not require setting aside the approval.  (See *Endangered Habitats, supra,* 131 Cal.App.4th at p. 783.)  Here, the Project had noise mitigation.  Whether further mitigation was "feasible," such that the policy was violated, was a decision within the discretion of City.  The City's decision to find the noise consistent with the general plan meets the reasonable person standard. (*Clover Valley, supra,* 197 Cal.App.4th at p. 238.)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment, consistent with section 21168.9 and this opinion, granting ESPLC's petition for a writ of mandate.  The parties shall bear their own costs on appeal.  (See Cal. Rules of Court, rule 8.278(a).)

/s/
Duarte, J.

We concur:


/s/
Raye, P. J.


/s/
Butz, J.