Filed 5/12/22  Hammond Landowners Assn. v. City of Weed CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| HAMMOND LANDOWNERS ASSOCIATION, | C091404 |
| Plaintiff and Appellant, | (Super. Ct. No. SCCVCVPT20181532) |
| v. | |
| CITY OF WEED et al., | |
| Defendants and Respondents; | |
| LOVE'S TRAVEL STOP, | |
| Real Party in Interest and Respondent. | |

The Hammond Landowners Association (Association) filed a petition for writ of mandate challenging the decision of the City of Weed's City Council to certify a final environmental impact report (EIR) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and approve a project to construct and operate a Love's Travel Stop.  The trial court denied the writ petition.  The Association

1

now contends the EIR's discussion of the project's impacts on traffic, noise, general plan consistency, aesthetics and alternatives is inadequate and the City failed to recirculate the EIR after it added significant new information to the draft EIR.

We conclude the EIR's discussion of noise impacts violated CEQA because it did not consider the magnitude of noise increase caused by the project in evaluating the potential significant environment effects of changes in noise levels. We also conclude the EIR did not adequately evaluate the potential noise impacts of the project because it did not discuss the combined effect of existing noise and noise from identified project-related noise sources that would occur simultaneously. Otherwise, we conclude the Association failed to carry its burden of showing an abuse of discretion.

We will reverse the judgment with regard to the EIR's threshold of significance for noise impacts and the EIR's discussion of ambient noise levels and the combined effect of all project-generated noise that would occur simultaneously and direct the trial court to issue a writ of mandate consistent with this opinion. We will otherwise affirm the judgment.

BACKGROUND

Love's Travel Stops and Country Stores (Love's) proposes to construct and operate a Love's Travel Stop on a 17.61-acre site located on the west side of Interstate-5 (I-5) at the Vista Drive offramp in the City of Weed (City) in Siskiyou County. The project site is immediately adjacent to I-5. The general vicinity is rural and primarily undeveloped, with the exception of paved roadways, overhead electrical lines and some residential development to the west. The project site's general plan land use designation is General Commercial. The project site was approved for an ARCO station in 2012, but it was not developed. Land adjacent to the west of the project site is also designated for commercial development. Further west of the commercial area, there is a large open space between the commercial area and a residential area. Development east of the project site and I-5 includes fast food restaurants, a Grocery Outlet store, hotels, and gas

2

stations. The project would consist of a 16-position car fueling station, an 8-position truck fueling station, an 8,450-square-foot convenience store, two fast food restaurants, a roughly 9,800-square-foot vehicle maintenance building, a truck scale, and parking spaces for 74 automobiles and 97 trucks. The travel stop would be open 24 hours a day, seven days a week.

Acting as lead agency, the City prepared a draft EIR for the project. Following a comment period, the City adopted a resolution certifying the final EIR, adopting CEQA findings of fact and a statement of overriding considerations and approving the project, subject to the conditions of approval attached to the resolution. The City concluded that the project would result in a significant and unavoidable impact, even with the implementation of all feasible mitigation measures, in that the project would create a new source of substantial light or glare that would adversely affect views in the area, but the benefits of the project, in terms of creating employment opportunities for local residents, generating sales and property taxes for the City and developing a site that was identified as a key growth area in the City, outweighed the unavoidable and significant impact.

The Association filed a petition for writ of mandate against the City and its City Council to set aside the project approvals, including the certification of the final EIR. The trial court denied the writ petition and entered judgment against the Association.

STANDARD OF REVIEW

The standard of review in a CEQA case is abuse of discretion. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) But we determine de novo whether the EIR's discussion of environmental impacts, alternatives, or other required information is adequate, that is, whether the discussion is " ' " 'sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' " (*Id.* at p. 516; see also *id*. at pp. 513-516.) In doing so, we keep in mind that our role is to determine whether the EIR is sufficient as an informational document, not whether the agency's conclusions are correct. (*Laurel*

3

*Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights Improvement Assn.*).)  We review the agency's factual determinations—e.g., challenges to the scope of the EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied—for substantial evidence.  (*Sierra Club,* at p. 516; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*); *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1296.)  Under that standard, we accord deference to the City's substantive factual conclusions, we do not set aside its determination on the ground that an opposite conclusion would have been equally or more reasonable, we do not reweigh conflicting evidence, and we resolve reasonable doubts in favor of the City's findings and decision.  (*Sierra Club,* at p. 512; *Berkeley Keep Jets Over the Bay Com. v. Board of Port Comrs.* (2001) 91 Cal.App.4th 1344, 1356 (*Berkeley*).)  We presume the challenged EIR is adequate, and the party challenging the EIR bears the burden of proving it is inadequate or insufficient evidence supports one or more of its conclusions.  (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924-925.)

DISCUSSION

I

The Association contends that instead of using actual point-of-sale data from existing Love's Travel Stops, the EIR's Traffic Impact Analysis Report relied on an improper blend of the trip-generation rates, resulting in trip-generation data that understated the number of anticipated project-related vehicle trips and in the failure to identify significant impacts at several key intersections and roadway segments and feasible and enforceable mitigation measures.

The Association's appellate claim is based on traffic engineer Ravi Narayanan's review of the draft EIR's Traffic Impact Analysis Report.  Narayanan's comments and responses to those comments, as with all comments to the draft EIR and responses to

4

comments discussed herein, are part of the final EIR. (Guidelines, § 15362, subd. (b).) The responses to comments were prepared by Ascent Environmental, Inc., the consultant who prepared the EIR, and were reviewed and approved by City staff. We will refer to them as the City's responses for ease of reference.

The City explained in its response to comments that the Traffic Impact Analysis Report used data from an Institute of Transportation Engineers (ITE) manual, which contained the best available industry standard data at the time the traffic study was initiated. The City agreed with Narayanan that the ITE manual did not have a "truck stop" use category. Although the manual had a "truck stop lane" use category, the City did not use that category because data for that category was based on a very small sample size and was generally not considered robust enough to apply in a traffic analysis. The City explained that existing studies for truck stops did not consider the array of services provided in modern travel stops; therefore, traffic consultants combined available trip-generation studies to estimate truck-stop trip generation. The Traffic Impact Analysis Report used four use categories from the ITE manual, consistent with some of the uses of the project: (1) gasoline service station with convenience market; (2) fast food restaurant without drive thru; (3) fast food restaurant with drive thru; and (4) truck tire stop. The final EIR—in particular, "Love's Trip Generation and General Characteristic Study" (Appendix B to the final EIR) (hereafter Study)—recognized the shortcomings of combining trip-generation studies to estimate truck-stop trip generation, including potentially overpredicting trip generation, but explained that data from six Love's Travel Stop in California and in-field survey questionnaires were obtained to assess the data in the ITE manual. The Study concluded that the estimated project trip-generation rates in the Traffic Impact Analysis Report were overestimated by approximately 30.6 percent for a.m. peak hour trips and 17.5 percent for p.m. peak hour trips. Thus, the City concluded that the assumptions in the Traffic Impact Analysis Report were conservative and likely overstated vehicle trips to be generated by the project.

5

With regard to actual point-of-sale data, the City explained that using point-of-sale information was not a reliable method for estimating vehicle trips. The City said point-of-sale data indicated the number of retail transactions that occurred at a facility, which was different than the number of trips generated. For example, a patron might stop at a facility to use the restroom without making a purchase, and because there was no point of sale the trip would not be counted. On the other hand, a patron might purchase fuel, convenience items and a fast-food item, registering three point-of-sale transactions that would be calculated as three trips rather than one.

As the lead agency, the City had discretion in selecting the methodology to be used in evaluating traffic impacts, subject to review for substantial evidence. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 337.) The City's responses to Narayanan's comments showed that substantial evidence supported the methodology used for studying estimated project trip-generation rates.

The Association also argues that the Traffic Impact Analysis Report fails to distinguish between truck trips and automobile trips or discuss the number of project-generated truck trips. This claim is also based on Narayanan's comments.

The City said, in response to Narayanan's comment, that a breakdown of the type of vehicle (i.e., trucks versus automobiles) was not necessary in determining project trip-generation rates because truck traffic was accounted for as an input variable in the traffic analysis software. The City acknowledged that there was a relatively high percentage of truck traffic in the vicinity of the project because of an existing Pilot Travel Center near the project site and that traffic data collected at study intersections indicated that truck volumes were near 50 percent. But the City said that the high percentage of truck traffic was applied to future conditions. The Association fails to show that the EIR did not discuss how much truck traffic the project will generate and that the failure to segregate truck trip-generation rates from the estimated project trip-generation rates shown in the

6

Traffic Impact Analysis Report resulted in a failure to inform the City and the public of the project's potential transportation and traffic impacts.

The Association further asserts that the EIR should have addressed traffic impacts to Sugar Pine Road. Citing an e-mail from John Brennan, the Association says residents on Sugar Pine Road observed trucks and automobiles using Sugar Pine Road and indicated that the project will materially increase the traffic volume on Sugar Pine Road, causing various environmental impacts.

A "lead agency shall determine whether a project may have a significant effect on the environment based on substantial evidence in light of the whole record." (Pub. Resources Code, § 21082.2, subd. (a).) Testimony by property owners about existing environmental conditions can form the basis of substantial evidence. (See *Keep Our Mountains Quiet v. County of Santa Barbara* (2015) 236 Cal.App.4th 714, 730-731 (*Keep Our Mountains Quiet*).) But the e-mail from Brennan does not state that Brennan resides on Sugar Pine Road or in the vicinity of the project site. The e-mail does not state the foundation for Brennan's statements and opinions. (Cf. *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 173 [an adjacent property owner may testify to traffic conditions based on personal knowledge].) " '[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence.' " (*Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 289 (*Aptos Council*); see CEQA Guidelines, § 15384, subd. (a) [unsubstantiated opinion or narrative does not constitute substantial evidence]; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1352 (*Leonoff*) [claim by project opponent which did not state its factual basis is not substantial evidence].)

Citing various comments to the draft EIR, the Association also claims that the City was aware that nonresidents used Sugar Pine Road. The portions of the record the Association cites do not support the Association's assertion and do not state the basis for

the statement in the comments that trucks used Sugar Pine Road or will use that road if the project is implemented. The cited statements do not constitute substantial evidence. (*Aptos Council, supra*, 10 Cal.App.5th at p. 289; see CEQA Guidelines, § 15384, subd. (a); *Leonoff, supra*, 222 Cal.App.3d at p. 1352.)

A project vicinity map in the draft EIR (Exhibit 3.14-1) shows an unpaved access road and Sugar Pine Road in relation to the project site. In response to Brennan's comment, the City explained that the access road was not included in the traffic analysis because it was not a public roadway. The City said the access road was marked by "private road" and "no trespassing" signs and Hammond Ranch residents used the access road, but the City was unaware of any easement on that road other than the public service easement granted to the City to access a water tower. The City explained that the assumption in the EIR regarding use of the access road was based on the testimony of residents at the August 15, 2018 City Planning Commission hearing. That assumption was supported by comments to the draft EIR indicating that the section of Sugar Pine Road connecting to Mountain View Drive was a private road. The City added that in any event, local residents served by the access road would predominantly use that road and if local residents living west of I-5 used the access road, such use would not cause transportation impacts because the number of residents who would use the road would not be large, and the ingress and egress points for the project site would be at Vista Drive and Mountain View Drive. The Project Vicinity Map supports the conclusion that trucks using the proposed Love's Travel Stop would not use Sugar Pine Road to access I-5.

The Association fails to demonstrate that the City's conclusions about the use of Sugar Pine Road and the access road were not supported by evidence in the record. The Association also fails to show that the failure to include Sugar Pine Road and the access road in the study area for traffic impact analysis was an abuse of discretion.

The Association states in its appellate opening brief that specific deficiencies in the EIR's traffic analysis are discussed in Narayanan's memorandum. To the extent the

8

Association is relying on claims in the Narayanan memorandum that are not developed in its appellate briefs, an appellant must fully present all arguments in its briefs rather than incorporate them by reference. (See *Aguimatang v. Cal. State Lottery* (1991) 234 Cal.App.3d 769, 796.) We do not consider any claims not fully briefed by the Association.

II

The Association also raises various challenges to the noise impact analysis in the EIR. We consider each of those claims next.

A.     Actual Noise Measurements

The Association argues the EIR's discussion of noise impacts is deficient because no actual noise measurements were taken.

The draft EIR's discussion of existing traffic noise levels, potential short-term construction-related noise impacts, and potential long term operation-related noise impacts were based on noise modeling and not actual noise measurements taken in the project area. Citing a comment letter by Sugar Pine Road resident Erich Ziller, the Association asserts that the EIR should have used actual noise measurements from the Pilot Travel Center located east of I-5 to assess the project's noise impacts. Ziller did not state the basis for his opinion. " '[I]nterpretation of technical or scientific information requires an expert evaluation. Testimony by members of the public on such issues does not qualify as substantial evidence.' " (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 690-691.) Ziller's unsubstantiated lay opinion does not constitute substantial evidence that actual noise measurements were necessary.

Citing a comment letter by Dale La Forest, a "Professional Planner, Designer, INCE Associate (Institute of Noise Control Engineering)," the Association urges that the EIR's noise impact analysis should have been based on actual ambient noise levels. The City explained, in response to La Forest's comments, that the ambient noise environment

9

in the project area was evaluated in the draft EIR. In particular, noise levels from traffic noise in the area were summarized in the draft EIR using noise modeling and recent traffic volumes provided in the Traffic Impact Analysis Report and obtained from CalTrans. The City explained that the modeling used in the draft EIR took into account long-term traffic noise and annualized noise events, which was more accurate than short-term noise monitoring data in determining noise levels. The City pointed out that La Forest did not explain why the measurement of noise levels based on noise modeling was insufficient.

The Association fails to show that substantial evidence did not support the methodology used in the EIR to determine noise levels. The Association prefers actual noise measurements, but does not show that the use of noise modeling yielded unreliable, misleading or inaccurate data. (See *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 299 (*East Sacramento Partnerships for a Livable City*) [when a challenge is brought to studies on which an EIR is based, the issue is whether the studies are sufficiently credible to support the agency's decision and the party challenging the EIR bears the burden of demonstrating that the challenged studies are clearly inadequate or unsupported].)

Citing another comment letter by La Forest, the Association challenges the EIR for not measuring ambient noise levels at houses located 1,700 feet from the project site. The City explained, in response to La Forest's comment, that as stated in the draft EIR the nearest noise-sensitive receptor to the project site was a house that was about 650 feet away. The City reasoned that because that house would not be exposed to project-related noise that exceeded applicable noise standards, houses that were farther away would also not be exposed to noise levels exceeding the applicable standards. The response to comments adequately addressed the concern that the draft EIR did not consider houses that were 1,700 feet from the project site. (Guidelines, § 15088, subd. (c) [in general, a

10

response to comments must contain good faith, reasoned analysis and explain why specific comments and suggestions were not accepted].)

B.     Threshold of Significance

Citing La Forest's comment letter, the Association also asserts that the EIR should have addressed the magnitude of noise increase to determine the significance of any change in noise level.

The draft EIR described the standard used in the EIR for determining whether the project would have a significant adverse effect related to noise.  That standard was based on noise standards found in the Siskiyou County General Plan, the standards recommended by the Federal Interagency Committee on Aviation Noise, and the professional judgment and knowledge of City staff and the expert noise consultants who prepared the technical noise analysis for the draft EIR.

La Forest criticized the draft EIR for only measuring whether the project's noise level would exceed fixed noise standards and suggested that the EIR should have considered how much of an increase in noise might occur.  The City responded that there was no evidence the noise standards used in the draft EIR were insufficient and CEQA did not require the City to employ a significance threshold focused solely on the extent of increases in ambient noise levels.  The City added that the noise standard used in the draft EIR was consistent with the noise standards of neighboring counties.  The City also stated that CEQA gave agencies discretion to develop their own threshold of significance for noise impacts, and the City exercised its discretion to use a threshold of significance based on the City's 2040 General Plan.

The City is correct that it had discretion under CEQA to develop its own threshold of significance for noise impacts.  (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 883-884 (*King & Gardiner Farms, LLC*); *East Sacramento Partnerships for a Livable City, supra*, 5 Cal.App.5th at p. 300.)  But compliance with a threshold such as the noise standard set forth in a general plan does not relieve a lead

11

agency of the obligation to consider substantial evidence indicating that the project's environmental effects may still be significant. (Guidelines, § 15064, subd. (c); *King & Gardiner Farms, LLC,* at p. 887 [conformity with a maximum noise level specified in a general plan does not prevent a fair argument from being made that the proposed project will generate environmentally significant noise impacts]; *East Sacramento Partnerships,* at pp. 301-303 [finding traffic impact analysis deficient where the EIR found impacts less than significant based solely on the mobility element in the City's general plan, without any evidence that such impacts were insignificant]; *Keep Our Mountains Quiet, supra,* 236 Cal.App.4th at p. 732; *Berkeley, supra,* 91 Cal.App.4th at p. 1381 ["the fact that residential uses are considered compatible with a noise level of 65 decibels for purposes of land use planning is not determinative in setting a threshold of significance under CEQA"].) " '[T]he fact that a particular environmental effect meets a particular threshold cannot be used as an automatic determinant that the effect is or is not significant.' " (*East Sacramento Partnerships,* at pp. 302-303.)

In *King & Gardiner Farms, LLC*, the thresholds of significance for noise impacts were based solely on whether the estimated ambient noise level with the project would exceed the 65 decibels (dB) threshold set forth in the County's general plan. (*King & Gardiner Farms, LLC, supra,* 45 Cal.App.5th at pp. 830, 889-890.) The appellate court held the exclusive reliance on such a standard did not provide a complete picture of the noise impacts that may result from the project. (*Id.* at p. 893.) The appellate court explained: "The cumulative noise level of 65 dBA DNL does not provide a complete and reasonable method of evaluating the significance of noise impacts because an increase in ambient noise of 20 dBA at monitoring site number 12, which was recorded as being 44.8 dBA, would not be a significant, adverse change in the noise environment. In contrast, a 2 dBA increase at monitoring site number 2, which was recorded as being 63.9 dBA, would be considered a significant adverse change in the noise environment. The EIR does not provide a rational explanation for this approach to environmental change.

12

Simply saying the cumulative noise level would not be exceeded at site number 12 and would be exceeded at site number 2 does not provide a rational explanation for why a 20 dBA increase is an insignificant increase at site 12."[1] (*Ibid.,* italics omitted.) Thus, a lead agency should consider not only the absolute noise level associated with a project but also the increase in noise level caused by the project. (*King & Gardiner Farms, LLC, supra*, 45 Cal.App.5th at p. 887; *Keep Our Mountains Quiet, supra*, 236 Cal.App.4th at p. 732.)

Here, the standard used in the EIR for determining whether the project would have a significant adverse effect related to noise was based solely on whether project-generated noise levels will exceed the standards set in the Siskiyou County General Plan or by the Federal Interagency Committee on Aviation Noise. Table 3.12-7 of the draft EIR showed that project-related traffic noise would cause 13.7 dB and 12.3 dB increases at certain roadway segments. According to the draft EIR, a 10-dB increase was generally perceived as a doubling of loudness. The EIR contained no reasoned analysis why the City did not discuss whether the magnitude of noise increase caused by the project would result in potential significant noise impacts. For this reason, we conclude the EIR did not adequately inform the City and the public of the potential impacts of the project on noise.

The Association also criticizes the EIR for not considering all of the significance criteria set forth in Appendix G of the CEQA Guidelines. The thresholds of significance set forth in Appendix G are not mandatory. (*King & Gardiner Farms, LLC, supra*, 45 Cal.App.5th at p. 884; *Save Cuyama Valley v. County of Santa Barbara* (2013) 213

---

[1] "A decibel (dB) is a unit that describes the amplitude of sound and is expressed on a logarithmic scale. A common metric is the overall A-weighted sound level measurement (dBA), which measures sound in a fashion similar to the way a person perceives or hears sound." (*King & Gardiner Farms, LLC, supra*, 45 Cal.App.5th at p. 885, fn. 36.) "DNL" is the "Day-Night Average Level," which represents the existing ambient conditions, as measured over a 24-hour period. (*Id.* at p. 886, fn. 37.)

Cal.App.4th 1059, 1068.) Therefore, the City need not adopt those thresholds of significance. (*Ibid.*)

C.    Stand of Trees

The Association claims the draft EIR relied on a dense stand of trees between certain houses and the project site for a 5 dB decrease in the predicted noise exposure, but no such trees existed.

The Association's claim is not supported by the record. The draft EIR stated that a dense (approximately 400 feet deep) stand of trees stood between the project site and the nearest sensitive receptors. Exhibit 3.12-1 to the draft EIR, an aerial photograph, showed a stand of trees between the project site and the location of the nearest sensitive receptors. Consistent with the above, the City's resolution certifying the final EIR found that a "treed area at the southern end of the site provides a buffer between the proposed commercial use on the site and the existing residential parcels located beyond the city limits to the south."

D.    Hard Versus Soft Ground Surface Factor

Citing La Forest's comment letter, the Association argues the EIR assumed that operational noise would be absorbed by a soft ground surface, but the project will have a paved parking lot and the EIR should have used a hard ground surface factor for noise attenuation.

In response to comments by La Forest, the City explained that the project site will include paved surfaces, but it was appropriate to use a soft-surface assumption because soft ground will exist between the edge of the parking lot and sensitive receptors. Maps included in the draft EIR supported the claim about the location of soft surfaces. The Association fails to show that the assumption in the EIR regarding attenuation for acoustically absorptive or soft sites was not supported by substantial evidence.

14

E.      Effect of Topography on Sound Transmission to the Nearest House

Again relying on La Forest's comment letter, the Association claims the nearest house to the project site will be exposed to louder noise than assumed in the EIR because the house is located on a hillside so there is less ground absorption of sound wave energy along a straight line-of-sight path.

The draft EIR explained that a barrier that breaks the line of sight between a noise source and a receiver will typically result in at least 5 dB of noise reduction, and barriers higher than the line of sight provide increased noise reduction. The draft EIR said the nearest noise sensitive receptor was about 650 feet southwest of, and uphill from, the project site. The Master Response section of the final EIR further explained that, based on publicly available topographic data and mapping, although the nearest residence was approximately 80 feet higher in elevation than the project site, it was located on a downslope on the opposite side of the hill peak. The elevation change from the peak of the hill to the residence was approximately 14 feet, with no direct line of sight from the residence to the project site. The Master Response explained that, based on documented noise attenuating features of noise barriers, a barrier that was just tall enough to break the line of sight between a noise source and a receptor would provide at least 5 dB of noise reduction and could achieve an approximate 1 dB additional reduction for each two feet of height above where the sound barrier breaks the line of sight, with a maximum theoretical total reduction of 20 dB. The City concluded that the analysis in the draft EIR did not account for the minimum 5 dB of reduction provided by intervening topography. The Association fails to show that substantial evidence did not support the discussion in the EIR about the effect intervening topography would have on sound transmission from the project site to the nearest residence.

F.      Removal of Trees

The Association further argues the EIR's noise impact analysis is defective because it does not acknowledge that the project includes the removal of 145 mature trees

15

and that paving the site will allow more freeway noise to reach neighboring houses. The Association's claim is based on La Forest's comment to the draft EIR.

The draft EIR acknowledged that the project would include the removal of 145 mature trees within the project site. In response to La Forest's comments, the City stated that the 145 mature trees that would be removed between the project site and I-5 did not form a dense stand and no trees would be removed from within the right-of-way for the southbound I-5 onramp; thus, a substantial number of trees would remain in place between I-5 and the project site. The City clarified that the dense stand of trees on the hillside between the project site and the nearest sensitive receptor would remain and would decrease noise levels at the nearest sensitive receptor. The City acknowledged that paving of the site could slightly increase reflective noise from the freeway, but said the modeling in Table 3.12-7 (existing plus project traffic noise) assumed paved surfaces, and most of the distance between the freeway and sensitive receptors would remain unpaved after project construction. The City said the effect on freeway noise would be less than 1 dB, which would not be perceptible to the human ear. The Association fails to show the City abused its discretion in concluding that, with mitigation, the paving and the removal of 145 mature trees would not cause significant noise impacts.

G.     Noise Impacts on Undeveloped Lot

The Association next claims the EIR fails to discuss the project's noise impacts on an undeveloped residential parcel within 240 feet of the project site. The Association's assertion is again based on La Forest's comment letter.

The City explained that the residential lot La Forest referenced was vacant and was not considered a noise-sensitive receptor. The City stated that the owner of the undeveloped lot had not commented on any proposed use, so it would be speculative to assume one. The City reiterated that the nearest existing sensitive receptor was located 650 feet southwest of the project boundary.

16

"In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area as they exist at the time the notice of preparation is published, or where no notice of preparation is published, at the time environmental analysis is commenced." (Guidelines, § 15126.2, subd. (a).) The lead agency must determine whether the project may have a significant effect on the environment based on substantial evidence in light of the whole record. (Pub. Resources Code, § 21082.2, subd. (a).) Speculation is not substantial evidence. (Pub. Resources Code, § 21082.2, subd. (c).) The Association fails to show why the EIR should consider noise impacts to a possible future sensitive receptor at the undeveloped lot.

H.      Undisclosed Significant Noise Impacts

The Association also argues that noise tests conducted by La Forest indicated the project may have significant noise impacts and the EIR did not disclose or discuss those impacts. The Association identifies four impacts to noise at pages 43 to 44 of its appellate opening brief. Those alleged impacts are copied from La Forest's comment letter.

La Forest reached certain conclusions regarding project-related construction noise levels. His calculation was based on the combined noise of the four loudest pieces of equipment listed in the draft EIR. The City explained that calculations must reflect construction phasing and activities associated with that phase and the equipment La Forest selected for his noise level calculation would not operate in the same area at the same time. According to the City, the types of equipment that would produce higher noise levels were large and would not operate next to each other, as that would create a dangerous operating condition. The City concluded La Forest's construction noise level calculation was not substantial evidence that the project would result in potential significant noise impacts. The response to comments adequately responds to La Forest's

17

comment about construction noise impacts. (Guidelines, § 15088, subd. (c).) The Association does not show how the City's analysis is inadequate.

La Forest opined that project-related operation noise levels at the vacant undeveloped lot located about 240 feet from the project site will exceed applicable noise standards if a house is ever constructed on the lot. The City responded that La Forest's noise level calculation as to the undeveloped lot was not pertinent because there was no existing noise-sensitive receptor on that lot. For reasons we have stated, La Forest's comment did not constitute substantial evidence of potential significant noise impacts caused by the project.

La Forest also concluded that project-related operation noise at a house located about 650 feet from the project site would exceed the County's noise standard for interior rooms. The City responded that a qualified noise analyst observed the combined operation noise generated by the Pilot Travel Stop in Weed, took daytime noise measurements at a Sacramento 49er Travel Stop in West Sacramento (a travel stop that was adjacent to I-80 and had a convenience store and restaurant, but was larger in scale than the project), and determined that the reference operation noise level used in the draft EIR was higher than the combined operation noise generated at the Pilot Travel Stop and the measured noise level at the Sacramento 49er Travel Stop. Using sound level measurements obtained at a large truck distribution center in Apple Valley in 2006, the draft EIR assumed that on-site operational activities could generate a combined hourly average noise level of approximately 84 Leq[2] and a maximum noise level as high as 86

---

[2] Leq or "Equivalent Continuous Sound Level" "represents an average of the sound energy occurring over a specified period. In effect, Leq is the steady-state sound level containing the same acoustical energy as the time-varying sound that occurs during the same period."

18

Lmax[3] at 50 feet from the project boundary. In comparison, the highest combined noise levels measured at the Sacramento 49er Travel Stop were 68.2 Leq and 81.8 Lmax at 25 feet from the edge of the site. The City concluded, based on the measured combined noise level at the Sacramento 49er Travel Stop, that noise exposure from long-term project-related operation noise at sensitive receptors in Siskiyou County would be much lower than stated in the draft EIR. The City's detailed response to La Forest's comment contains substantial evidence supporting the City's conclusion about the potential significant noise impacts of the project-related operation noise.

La Forest further opined that the project's cumulative noise impact to residents in the vicinity will be significant when added to that of past projects at the South Weed exit to I-5, to the east of the project site, and he specifically discussed noise from the Pilot Travel Center. La Forest said the noise level measurements he took at a house located 1,700 feet from the project site showed that truck noise from the Pilot Travel Center could be heard from 6:00 p.m. to 6:00 a.m. He said the timing of the truck noise coincided with the arrival, idling, and departure of trucks at the Pilot Travel Center and such noise would be much louder if it came from the project site. La Forest's data showed recorded noise levels peaked at 7:00 a.m. at about 55 dBA.

The City noted, in response to La Forest's comments, that the Pilot Travel Center was about 4,400 feet from the house where La Forest took noise measurements and I-5 was located between the Pilot Travel Center and the house. The City pointed out that La Forest did not attribute any truck noise to I-5 traffic and instead assumed all of the truck noise emanated from the Pilot Travel Center. The City indicated that La Forest did not include observation-based evidence of what the predominant sources of noise were during nighttime hours. The City then questioned La Forest's report of 55 dBA,

---

[3] Lmax or "Maximum Sound Level" "is the highest instantaneous sound level measured during a specified period."

explaining that assuming all of the truck noise was generated by the Pilot Travel Center the Pilot facility would have to generate noise levels of about 100 Leq at 25 feet to produce the 55 dBA La Forest reported, and such a noise level greatly exceeded the measured noise levels from the Sacramento 49er Travel Stop.

La Forest's comments did not state the foundation for his conclusions about the source of truck noise in his noise tests. He did not state how he concluded that the truck noise detected during his noise tests came from the Pilot Travel Center, and he did not explain the basis for his conclusion that trucks arrived at, idled, and departed from the Pilot Travel Center between 6:00 p.m. and 6:00 a.m. Because it is not supported by stated facts, his opinion does not constitute substantial evidence that the project may have a significant effect on the environment. (Pub. Resources Code, §§ 21080, subd. (e), 21082.2, subd. (c); Guidelines, § 15064, subd. (f).) In any event, assuming that La Forest qualifies as an expert, disagreement among experts does not make an EIR inadequate. (Guidelines, § 15151; *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 371.) When an expert disagrees with the conclusions reached by other experts in the subject area, the EIR need only summarize the main points of disagreement. (Guidelines, § 15151; *Eureka Citizens for Responsible Government,* at p. 371.) Perfection is not required; courts look only for adequacy, completeness, and a good faith effort at full disclosure. (Guidelines, § 15151.) Here, the final EIR included La Forest's comments on potential noise impacts and the City's responses to those comments. " 'When the evidence on an issue conflicts, the decisionmaker is "permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others." [Citation.]' " (*East Sacramento Partnerships for a Livable City, supra*, 5 Cal.App.5th at p. 299.) The City was not required to credit La Forest's representations. (*Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 207 (*Mount Shasta*

20

*Bioregional Ecology Center*).)  The response to comments contains substantial evidence supporting the City's decision to reject La Forest's conclusions.

I.        Considering Ambient Noise and All Project-Related Noise Together

The Association further contends that the EIR only examined noise generated by the project and did not compare or add that noise to existing ambient noise levels.

La Forest criticized the draft EIR for calculating off site and on site noise separately and not adding them together even though both types of noise would occur simultaneously.  The Master Response in the final EIR acknowledged that all noise sources must be considered when determining total noise exposure.  But the EIR segregated the noise impacts caused by project-related construction noise, increased traffic noise, intermittent single-event noise from trucks, and operational non-transportation noise, and failed to discuss whether noise from those sources would occur simultaneously and the combined effect of noise that would occur simultaneously. Because it does not discuss the combined effect of existing noise and noise from identified project-related noise sources that would occur simultaneously, the EIR does not adequately evaluate the potential noise impacts of the project.

III

In addition, the Association claims the EIR fails to adequately discuss the project's inconsistencies with the City's 2040 General Plan Policy CD 3.1.4 and Program Policy CI 1.2.1.4.

An EIR must discuss any inconsistencies between the proposed project and applicable general plans.  (Guidelines, § 15125, subd. (d).)  " ' " 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.'  [Citation.]" [Citation.]  State law does not require perfect conformity between a proposed project and the applicable general plan . . . .'  [Citation.]"  " 'When we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's

21

determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] . . . A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.] [¶] Accordingly, an agency's 'findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion. [Citation.]' [Citation.] The party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable." (*The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 896; see also *East Sacramento Partnerships for a Livable City, supra*, 5 Cal.App.5th at p. 305 [a city's determination that a project is consistent with the city's general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion].)

Policy CD 3.1.4 of the City's 2040 General Plan stated, "The City shall require new development to locate parking behind structures to improve the pedestrian experience along commercial corridors." La Forest opined that the project violated Policy CD 3.1.4 because its parking lot would be visible to pedestrians on Vista Drive and Mountain View Drive. In response, the City explained that Policy CD 3.1.4 did not apply to the project because the project site would not be located along a commercial corridor.

Citing La Forest's comment that Vista Drive and Mountain View Drive were on a commercial corridor, the Association disputes the City's response. But La Forest did not state the basis for his assertion that Vista Drive and Mountain View Drive were on a commercial corridor; accordingly, his comment was not substantial evidence supporting an inconsistency with Policy CD 3.1.4. The Association also cites a page from the Weed General Plan Background Report for 2015-2016 in support of its contention that the

22

project was on a commercial corridor. The cited page refers to the future expansion of "the South Weed economy as the main highway commercial corridor." The cited page does not state that the portion of Vista Drive or Mountain View Drive where the project was proposed to be built was a commercial corridor. Another part of the draft EIR explained that the project site consisted of partially disturbed and partially wooded vacant land adjacent to I-5 and the area immediately surrounding the site was primarily undeveloped.

The City further explained in its response to comments that if Policy CD 3.1.4 applied to the project, the intent of the policy was to enhance the pedestrian experience, and the design of the project comported with that intent because conifers, oak trees, and shrubs would be planted around the majority of the project site. A map titled "Proposed Palette" supported the description in the response to comments of screening conifers, oaks and shrubs. The City concluded that once matured, landscaping would screen most of the project site from adjacent uses. Also, the City's approval of the project was conditioned on the retention of a sufficient number of trees on the western edge of the property along the boundary of a private access road and Mountain View Drive, as reasonably practical, to provide screening and reduce the visibility of the site from adjacent roadways. The City said the landscaping plan would improve the pedestrian experience on the new sidewalks that would be provided by the project. Although the Association cites La Forest's dispute of the City's claim that landscaping would screen most of the project site from adjacent uses, the City was permitted to give more weight to the opinion of its expert. (*East Sacramento Partnerships for a Livable City, supra*, 5 Cal.App.5th at p. 299.) The Association fails to show that the determination in the EIR that the project was consistent with the intent of General Plan Policy CD 3.1.4 was unreasonable.

23

The Association also contends the EIR is deficient in that it did not disclose the project's inconsistencies with Program Policy CI 1.2.1.4, which required new developments to provide adequate pedestrian access within and surrounding the project.

The exact issue raised on appeal must have been presented to the public agency orally or in writing. (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 623 (*North Coast Rivers Alliance*); *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 791.) Exhaustion of administrative remedies is a jurisdictional prerequisite and the Association bears the burden of proof to show exhaustion occurred. (*North Coast Rivers Alliance,* at p. 624; *Mount Shasta Bioregional Ecology Center, supra*, 210 Cal.App.4th at pp. 215-216.) The Association does not cite where in the voluminous record on appeal the claim that the EIR did not adequately address the project's inconsistency with Program Policy CI 1.2.1.4 was raised. The claim has not been preserved for review.

IV

The Association argues analysis of aesthetic impacts in the EIR is inadequate and incomplete. We will address each of the Association's claims.

A.      Visual Impact of Improvements and the Removal of Trees

The Association takes issue with the statement in the draft EIR that the "removal of trees and improvements related to the proposed project would improve certain visual components of the site." Echoing a comment by Erich Ziller, the Association says the ability to see a wooded hillside following tree removal would not mitigate the visual impact of a 16-position automobile fueling station, 8-position truck fueling station, convenience store, fast food restaurants, vehicle maintenance building, truck scale, diesel storage tanks, truck and auto parking, onsite lighting, and pavement on a currently natural site.

Answering Ziller's comment, the City explained that although the project would detract from the rural forest character of the area, the wooded hillside south of the project

24

site would still be visible and Mount Shasta would remain the focal point of skyline views. The City pointed out that as a condition of approval, Love's would be required to retain trees on the western edge of the property along the boundary of an access road and Mountain View Drive to screen the project site from adjacent roadways. The City acknowledged that visual changes were highly subjective and stated that the analysis in the draft EIR was not intended to suggest that the project would improve the visual character of the area; rather, it suggested there would be a change that in some instances would lower visual quality, but the change would not be substantial in light of the location, setting, and design of the project. A reader can assess the comment and response by examining Exhibits 3.1-4a, 3.1-4b, 3.1-5a and 3.1-5b in the final EIR, which contain simulated depictions of the project from two viewpoints, although landscaping which would screen many of the structures was not included in the simulations.

" '[A] lead agency has the discretion to determine whether to classify an impact described in an EIR as "significant," depending on the nature of the area affected. [Citations.] In exercising its discretion, a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. [Citation.] Where the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion. [Citation.]' " (*North Coast Rivers Alliance, supra*, 216 Cal.App.4th at pp. 624-625; see also *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 243 (*Clover Valley Foundation*).) The issue is whether substantial evidence supports the agency's conclusions. (*North Coast Rivers Alliance,* at p. 626.)

The EIR discussed the visual impacts of project structures and removing trees from the site and set forth the City's conclusions that the potential impacts would be less than significant. The response to comments, the exhibits in the final EIR, and the landscaping plan showing the presence of screening conifers, oaks and shrubs around the project site, constitute substantial evidence supporting the conclusions in the EIR.

25

(*Clover Valley Foundation, supra*, 197 Cal.App.4th at pp. 243-244 [rejecting challenge to EIR's conclusion about impacts on views where the EIR explained that the impact would not be significant because there was a buffer between the valley floor and the new houses to be built on the top of the ridge and the area is already a residential area].)  That the Association disagrees with the EIR's conclusions does not establish that the EIR is deficient.  (*North Coast Rivers Alliance, supra*, 216 Cal.App.4th at pp. 627-628.)

The Association next faults the visual simulations in the EIR for not showing the aesthetic impact of having trucks and cars using the services at the site and all of the parking spaces at the site occupied.

Exhibits 3.1-4 and 3.1-5 in the draft EIR and the revised simulations in the final EIR do not depict the project site with cars and trucks.  In response to a comment that the simulations from Viewpoint 2 should include trucks and other vehicles, the City explained why cars and trucks were not included in the simulations.  The City said the primary visual feature of the project would be the buildings, signs, and light fixtures; cars and trucks would not be taller than any of the project structures, so including vehicles in the simulation would partially obscure project features and would not substantively add value to the analysis or alter the conclusions of the analysis.  The Association fails to explain how including cars and trucks in the EIR simulations, such as was done in simulations presented by La Forest, would change the aesthetic impact analysis relating to tree removal.  (*Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1 [contention made without any argument or citation to supporting authority is forfeited]; *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655 [point made without factual analysis may be deemed forfeited].)  We also observe that the simulations presented by La Forest do not depict screening trees and shrubs around the project site, as proposed in the landscaping plan.

26

B.    Impact on Scenic Highway View

The Association next argues the EIR fails to evaluate the project's aesthetic impact on the views of motorists traveling on I-5 and looking west toward Mount Eddy.

In response to a comment that the draft EIR did not evaluate impacts to views of Mount Eddy as seen by motorists on I-5, the City explained that the project will be largely screened by landscaping from I-5, and that project structures, other than the sign, would be barely visible to passing motorists on I-5 and would not substantially interfere with views of the mountain.  The City also said the view would be seen for a short period of time only.  The City further noted that the visual simulation prepared by La Forest of views from I-5 did not include the proposed landscaping and was, therefore, not an accurate depiction of the view of the project.  We conclude that the response to comments adequately discussed the project's aesthetic impact on the views of I-5 motorists looking west toward Mount Eddy.  (Guidelines, § 15088, subd. (c) [requiring response to comments to be made in good faith and with reasoned analysis and factual information].)

The Association also argues substantial evidence does not support the EIR's conclusion that the project would be visually similar to existing development on the east side of I-5.  We disagree.

The EIR explained that the east side of I-5 was developed with businesses such as fast food restaurants, a Grocery Outlet store, hotels, a truck stop, and gas stations that were visible from I-5.  Motorists on I-5 can see high-rise signs and buildings for businesses.  The viewshed also included freeway signs and off-highway signage.  The EIR noted that the project would introduce similar uses to the west side, but at a smaller scale, and immediately adjacent to the freeway.  The EIR concluded that the proposed project would be visually similar to existing nearby development.  The observation in the EIR that the area east of I-5 was already developed was consistent with comments by local residents.  The Association fails to show that the statements in the EIR are misleading or incorrect.

27

C.     Use of Two Viewpoints

The Association says the use of only two viewpoints to evaluate the aesthetic impacts of the project is inadequate.  Relying on La Forest's comment letter, the Association asserts that the EIR should have considered the viewpoints from westbound Vista Drive and Sugar Pine Road.

The EIR included photographs of existing conditions at two viewpoints and simulations depicting the project from those viewpoints.  Viewpoint 1 is from southbound South Weed Boulevard, close to its intersection with Vista Drive, looking south toward the project site.  Viewpoint 2 is from eastbound Mountain View Drive, west of its intersection with South Weed Boulevard and looking east toward the project site.

La Forest criticized the draft EIR for not using a viewpoint from westbound Vista Drive.  He said that more people would use Vista Drive than South Weed Boulevard to get to the project site.  A project vicinity map showed the project site is near the Vista Drive exit off I-5, supporting La Forest's opinion.  La Forest included a photograph showing the viewpoint from Vista Drive.

La Forest also criticized the draft EIR for not including a viewpoint from eastbound Sugar Pine Road, stating that trucks in the parking area of the project will block all views of Mount Shasta.  He included a photograph that purported to show a view of Mount Shasta from Sugar Pine Road, but we do not see a mountain in that photograph.  La Forest claimed, without citation to evidence, that more people would use Sugar Pine Road than Mountain View Road.  The accuracy of La Forest's claim is in doubt because the project vicinity map shows that I-5 motorists would not use Sugar Pine Road to access the project site, and the primary function of the project would be to serve as a travel stop for vehicles already traveling on I-5.

In response to La Forest's comments, the City explained that Viewpoints 1 and 2 represented the views where the project would be most visible to the public.  South Weed Boulevard (Viewpoint 1) was a major travel corridor in the City and represented a view

that much of the public would encounter. And Viewpoint 2 (Mountain View Road) was chosen because it included views of Mount Shasta, a prominent visual feature in the area. The City explained that the EIR focused on the viewpoint from Mountain View Road based on comments received in response to the Notice of Preparation (NOP) of the draft EIR regarding a nearby residential development. The City further stated that the photograph of the viewpoint from Vista Drive presented by La Forest was misleading in that it suggested the area was undeveloped when travelers on westbound Vista Drive would either be traveling from the commercial development on the east side of I-5 or exiting I-5. The City said in either instance, motorists would be traveling from a developed area and the project would appear, more or less, as a continuation of development.

The claim that the EIR should have included a viewpoint from Sugar Pine Road because more people would use Sugar Pine Road than South Weed Boulevard or Mountain View Drive is not supported by substantial evidence. The response to comments and the project vicinity map (Exhibit 3.14-1) show it was reasonable for the City to consider Viewpoints 1 and 2 as appropriate for the analysis of the project's aesthetic impacts. That others could argue that other viewpoints should have been considered does not make the discussion in the EIR inadequate. (See *Laurel Heights Improvement Assn., supra*, 47 Cal.3d at pp. 415-416.)

D.    Aesthetic Impact of 90-Foot Sign

The Association further contends the EIR fails to analyze the aesthetic impact of the 90-foot sign.

The Master Response of the final EIR explained that at the August 15, 2018 meeting of the City's Planning Commission, many local residents expressed concerns about the visual impacts of the off-site, 150-foot sign proposed in the draft EIR. In response to those concerns, Love's modified the project to replace the off-site, 150-foot sign with a 90-foot sign to be located on the project site.

29

Contrary to the Association's claim, the final EIR discussed the aesthetic impact of the 90-foot sign. The final EIR stated that the 90-foot sign would only be barely visible from northbound I-5, while visible from around 0.2 miles along southbound I-5. The final EIR included simulations showing a view of the sign from the freeway. The EIR preparer peer-reviewed those simulations and found the size, shape, and location of the sign in the viewshed to be accurate, but opined that the sign would not appear as prominently as shown in the simulations. The Master Response concluded that the sign height and visibility would be consistent with other signage in the area, would be visible for a short time only in either the northbound or southbound direction, and would not block any views.

The final EIR also included simulations depicting the new sign from Viewpoints 1 and 2. The Master Response explained that while the sign would disrupt the viewshed from Viewpoint 1 (South Weed Boulevard), that viewpoint was not a sensitive viewshed as it was located near a freeway offramp and the impact would only be seen for a brief time by vehicles approaching Vista Drive. The Master Response acknowledged that the impact at Viewpoint 2 (Mountain View Drive) would be more substantial. However, it said the view of Mount Shasta at Viewpoint 2 would not be blocked and the angle of the sign would minimize the disruption in view. Further, Mountain View Drive was a lightly traveled road and the view from Viewpoint 2 would be seen for a short period of time only as vehicles approach the freeway. The Master Response further concluded it was unlikely that the sign would be visible from any house in proximity to the project site because a dense line of trees would be located between the project site and the houses and those trees would remain, and the nearest houses would be located behind a ridgeline that would further block a direct view. The final EIR concluded that the 90-foot sign would not substantially affect a scenic vista, would not substantially damage scenic resources, and would not substantially degrade the existing visual character or quality of the area.

We conclude that the final EIR contained reasoned analysis of the aesthetic impacts of the proposed 90-foot sign. The Association fails to explain how a simulation presented by La Forest shows that the 90-foot, on-site sign would interfere with the scenic view of Mount Eddy from I-5.

V

The Association also argues that the EIR fails to adequately address the risk of wildfire from the wildland-urban interface of the project, including the increased risk caused by increased human activity in the project area. In particular, the Association says the City dismissed evidence of encampments by individuals experiencing homelessness in the area.

Contrary to the Association's contention, the EIR did not ignore the heightened risk of wildfire in the City. The draft EIR disclosed that the project contained areas of very high fire hazard severity and fire potential was associated with the surrounding wildland settings abutting the City. Impact 3.9-4 of the EIR disclosed that the project site included potential fire hazards such as unmaintained, fire-prone vegetation and existing ignition sources such as vehicles and electrical transmission lines, and the project would introduce new potential ignition sources, such as fueling stations, building materials and landscaping. The EIR acknowledged that the project would construct new structures; that up to 600 trucks and 1,200 cars per day would access the site; that the site would operate 24 hours a day and seven days a week; and that up to 12 employees would be located on the project site at one time. However, the EIR explained that the project would convert most of the site to maintained development with landscaping, a large paved area and parking areas. In addition, the project would provide defensible space around structures to reduce the risk of structure fires and include measures such as ignition-resistant construction, automatic interior fire sprinklers, a robust water delivery system, adequate emergency and fire apparatus access, and five fire hydrants. The EIR concluded that given project design measures, compliance with existing codes, policies and regulations,

31

and improved site emergency access, the project would not expose people or structures to a significant risk of loss, injury or death involving wildland fires, and would not exacerbate any existing risks.

The response to comments in the final EIR also acknowledged that the project site was in an urban/wildland interface, in an area with high fire potential. The Master Response reiterated how the project would include features to reduce the risk or spread of fires. The project was, thus, designed with consideration of wildfire hazards.

Commenters suggested the project would attract individuals experiencing homelessness, but no substantial evidence was offered to support those claims, and the City's Police Chief opined to the contrary. One comment to the draft EIR stated that individuals experiencing homelessness had started fires near the truck stop on the other side of the freeway. But the comment did not state the basis for the commenter's claim about a "trend of fires in the area." The City concluded that even if the project would attract individuals experiencing homelessness, there was insufficient evidence of a significantly increased fire hazard at the project site or surrounding community from the presence of such persons. (Guidelines, § 15064, subd. (f) [speculation or unsubstantiated opinion is not substantial evidence]; see *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1423 [stating that the unsubstantiated opinions and concerns by other residents about the project's effects did not constitute substantial evidence].) In any event, in response to concerns about the encampments near the project site, the City required Love's to construct a six-foot tall fence on the east, west and south sides of the project site, making access to the hillside behind the project site difficult and discouraging illegal camping near the project site. The Association fails to show that the EIR did not adequately discuss the project's potential significant effects on wildland fire hazard.

The Association asserted that the EIR simply deferred analysis of the wildfire risk and potential mitigation measures by stating that the Weed Fire Department and

32

California Department of Forestry and Fire Protection (CAL FIRE) would review the proposed project and recommend measures to reduce fire risk as required by the General Plan.

" '[I]t is improper to defer the formulation of mitigation measures until after project approval; instead, the determination of whether a project will have significant environmental impacts, and the formulation of measures to mitigate those impacts, must occur before the project is approved.' " (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906, italics omitted; see also Guidelines, § 15126.4, subd. (a)(1)(B).) As we have explained, the EIR discussed whether the project would have potential significant wildland fire hazard impacts. The EIR did not defer analysis of wildland fire hazard impacts.

The EIR noted that City of Weed General Plan Policy SF 3.3.1 would require the City Fire Department and CAL FIRE to review all development proposals and recommend measures to reduce fire risk. And those measures would be incorporated to reduce the flammability of the landscape. The EIR thereby committed Love's to incorporate measures to reduce the flammability of the landscape recommended pursuant to City of Weed General Plan Policy SF 3.3.1 into the project design. Such measures are not mitigation or deferred mitigation inasmuch as Impact 3.9-4 of the EIR concluded that with project design features the project would have a less than significant impact on wildland fire hazard.

VI

The Association argues that the EIR's discussion of alternatives is inadequate.

The EIR considered three potentially feasible alternatives to the project: a no project, no development alternative; the alternative of building a gas station instead of a travel stop at the project site; and the alternative of building a travel stop with a similar layout and scale, but located at a site on the east side of I-5. The Association's appellate claims are limited to the third alternative.

33

Alternative 3 was developed in response to commenters who recommended locating the project on the east side of I-5, on vacant land near existing commercial developments. After discussing the potential significant impacts of Alternative 3 on aesthetics, forest resources, air quality, biological resources, cultural and tribal resources, energy, geology and soils, greenhouse gas emissions and climate change, hazards and hazardous materials, hydrology and water quality, land use and planning, noise and vibration, public services, transportation/traffic, and utilities and service systems, as compared to the project, the EIR concluded that the potential significant impacts of Alternative 3 would be the same as with the project, except with regard to transportation/traffic. The draft EIR explained that traffic to the Alternative 3 site would primarily originate from I-5 and would travel from the freeway through two intersections in a commercial area of the City. The draft EIR said traffic going through those intersections would result in greater levels of congestion along East Vista Drive, as compared to the project. Although the degree to which traffic congestion would increase was unknown without preparing a traffic study, the draft said it was reasonable to assume that intersection and segment level of service would be degraded during the operation of the travel stop at the Alternative 3 site. The Association contends that the EIR overstated the environmental impacts of Alternative 3, but fails to explain how the discussion of Alternative 3's potential transportation/traffic impacts in the draft EIR was overstated. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987 (*California Native Plant Society*) [appellant bears the burden of showing how the alternatives analysis is deficient].)

The Findings of Fact and Statement of Overriding Considerations said the east side of 1-5 already had considerable economic activity, including a Pilot Travel Center. Under Alternative 3, the Love's project would be built directly across from the Pilot Travel Center, requiring traffic accessing the two travel stops to share use of East Vista Drive. The Findings of Fact and Statement of Overriding Considerations explained that

locating the project across the street from the Pilot Travel Center would "create the possibility of unacceptable congestion, possibly in the form of numerous trucks simultaneously trying to make left and right turns onto East Vista Drive, when such congestion can be completely avoided by locating the Love's Travel Center on the other side of the freeway on property under Love's control." The City's Findings of Fact and Statement of Overriding Considerations supported the statements in the draft EIR.

The Association next argues the EIR failed to state whether Love's can acquire the Alternative 3 site; thus, the EIR failed to provide sufficient information about whether Alternative 3 was feasible and the determination that Alternative 3 was not feasible on the grounds that Love's did not own or control the alternative site was not supported by substantial evidence.

"The issue of feasibility arises at two different junctures: (1) in the assessment of alternatives in the EIR and (2) during the agency's later consideration of whether to approve the project. [Citation.] But 'differing factors come into play at each stage.' [Citation.] For the first phase—inclusion in the EIR—the standard is whether the alternative is potentially feasible. [Citations.] By contrast, at the second phase—the final decision on project approval—the decisionmaking body evaluates whether the alternatives are actually feasible. [Citation.] At that juncture, the decision makers may reject as infeasible alternatives that were identified in the EIR as potentially feasible." (*California Native Plant Society, supra*, 177 Cal.App.4th at p. 981, italics omitted.)

The draft EIR included Alternative 3 as a potentially feasible alternative to the project and included a detailed discussion of Alternative 3. In response to comments, the City pointed out that, as stated in the draft EIR, Love's did not own the alternative site but nothing in the record suggested that Love's could not acquire the alternative project site. The City clarified that lack of ownership of the alternate site did not preclude consideration of Alternative 3 as a potentially feasible alternative.

As for the City's decision to reject Alternative 3 as infeasible, at the "final stage of project approval, the agency considers whether '[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the . . . alternatives identified in the [EIR].' [Citation.] Broader considerations of policy thus come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility of the alternatives." (*California Native Plant Society, supra*, 177 Cal.App.4th at p. 1000.) The agency may also consider whether an alternative is consistent with project objectives in assessing actual feasibility so long as the finding is supported by substantial evidence in the record. (*Id.* at p. 1001.) " 'If the agency finds certain alternatives to be [actually] infeasible, its analysis must explain in meaningful detail the reasons and facts supporting that conclusion. The analysis must be sufficiently specific to permit informed decision-making and public participation, but the requirement should not be construed unreasonably to defeat projects easily.' [Citation.] The infeasibility findings must be supported by substantial evidence." (*Id.* at p. 982.) Our review encompasses the entire administrative record of the proceedings. (*Id.* at pp. 997, 1003.)

The City rejected Alternative 3 as actually infeasible. That conclusion was supported by four reasons. First, because Love's did not own or control the alternative project site, the City acknowledged that it was possible Alternative 3 would not actually be implemented and none of the project objectives would be fulfilled. Second, the City said implementing Alternative 3 would not meet a key project objective: to construct a facility near a major freeway onramp/off-ramp to minimize traffic generation on local streets. In support of that reason, the City explained why Alternative 3 would have potential significant impact on traffic along East Vista Drive. Third, the City said implementing Alternative 3 would not meet another project objective to the same extent as the project—to provide a travel stop facility that maximizes its proximity to I-5 for all buildings and tenants—because the Alternative 3 site would not be visible from I-5.

36

Finally, the City found that Alternative 3 would represent an undesirable policy outcome. In particular, the City said there was no good reason to create the possibility of unacceptable congestion on the east side of I-5, when such congestion could be avoided by locating the project on the other side of the freeway. The City cited a comment letter from the City Manager and a report of the City's traffic consultant as support for that finding.

An agency may consider whether the project proponent owns or has access to alternative sites in assessing the feasibility of alternatives. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 574-575; Guidelines, § 15126.6, subd. (f)(1).) The Guidelines do not require the City to state whether Love's can reasonably acquire, control or otherwise gain access to the Alternative 3 site in assessing the feasibility of Alternative 3. (Guidelines, § 15126.6, subd. (f)(1).) The City's Findings of Fact and Statement of Overriding Considerations, together with the draft and final EIR, contain substantial evidence supporting the City's conclusion that Alternative 3 was infeasible.

The Association further contends Table 5.1 was misleading because the text of the EIR showed that placement of the project on the east side of I-5 would have less impacts on sensitive receptors on the west side of I-5; the statement that cultural and tribal resources could be impacted by east side placement was not substantiated; and the EIR said traffic impacts would be greater on the east side but the east side was already developed to handle such projects. The claims lack merit.

Table 5-1 of the draft EIR provided a summary of the environmental effects of Alternatives 1 through 3 in comparison with the project. The table stated that the noise impacts of Alternative 3 would be similar to the project. That information was consistent with the statements in the draft EIR.

With regard to cultural and tribal cultural resources, the draft EIR disclosed that Assembly Bill No. 52 required consultation with the same tribes as under the project, but

because the tribes had not been consulted and cultural resources surveys of the site had not been completed, it was unknown if any cultural sites were within or adjacent to Alternative 3 and if the impacts of Alternative 3 would be of lesser, similar or greater magnitude compared to the project. However, the draft EIR said any impact would be mitigable with the same measures as for the project and impacts would likely be similar to the project. The Association fails to explain how the above discussion was unsubstantiated.

As for traffic impacts, we conclude, based on our previous discussion, that Table 5-1 was consistent with the discussion in the draft EIR and the Association fails to show that the statements in the draft EIR were unsubstantiated.

The Association claims in perfunctory fashion that the EIR provided little or no quantifiable analysis of the level of reduction of impacts or the need for mitigation associated with each alternative. The Association says this deficiency is especially apparent with regard to the traffic impacts analysis. The Association forfeited its claims by failing to develop them with analysis and citation to authority and the record. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*).) It is not this court's obligation to develop the appellant's arguments. (*Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984 (*Maral*); *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 (*Dills*).)

## VII

The Association also claims the City was required to recirculate the draft EIR when it replaced the original 150-foot sign with a 90-foot sign and changed the location of the sign.

A lead agency must recirculate an EIR and provide a new public comment period when significant new information is added to the EIR after completion of consultation with other agencies and the public but before certification. (*Vineyard, supra*, 40 Cal.4th at p. 447.) New information added to an EIR is "significant" and recirculation is required

38

when the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project. (Guidelines, § 15088.5, subd. (a); *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1120, 1130 [Public Resources Code section 21092.1 is intended to encourage meaningful public comment].) The appellant bears the burden of demonstrating that the agency's decision not to recirculate the EIR is not supported by substantial evidence. (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 632.)

The Association points out that the final EIR included information not included in the draft EIR. But recirculation is not required simply because new information is added in the final EIR. (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 328.) It is true that the draft EIR does not discuss the aesthetic impact of a 90-foot high, on-site sign. But the portion of the record the Association cites—a comment letter by La Forest—does not support its contention that the proposed 90-foot sign raised "significant issues regarding aesthetics." The Association fails to show that the final EIR contained "significant new information" requiring recirculation, such as a disclosure showing that a new significant environmental impact would result from the project. (Guidelines, § 15088.5, subd. (a).)

The Association argues the final EIR included information about an underground stormwater pipe and discharge to a ditch that was not previously included in the draft EIR. The Association asserts, without citation to the record, that the discharge from the underground stormwater pipe could lead to water quality impacts that were not addressed in the draft EIR. We do not address the unsupported claim. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785; *Maral, supra*, 221 Cal.App.4th at p. 984; *Dills, supra*, 28 Cal.App.4th at p. 890, fn. 1.)

DISPOSITION

The judgment denying the petition for writ of mandate by the Association is reversed with regard to the EIR's threshold of significance for noise impacts and the EIR's discussion of ambient noise levels and the combined effect of all project-generated noise occurring simultaneously. The matter is remanded with directions for the trial court to enter a new judgment and issue a writ of mandate consistent with this opinion. The judgment is otherwise affirmed. Each party shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278.)


                                         /S/
                                    MAURO, J.



We concur:


      /S/
RAYE, P. J.


      /S/
DUARTE, J.